**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------ x
MARTHA PEREZ-PEDEMONTI, individually,   :
and on behalf of all others similarly situated,

                                          :

              Plaintiff,   :   **Case No. 22-6180**

                                  :

           - against -   :   **CLASS ACTION COMPLAINT**

                                  :   **Jury Trial Demanded**

THE CITY OF NEW YORK, JONI KLETTER   :
in her individual capacity, SOSIMO FABIAN in
his individual capacity, MICHAEL LEVARIO   :
in his individual capacity,

                                  :

             Defendants.
------------------------------------------------------------ X

       Plaintiff Martha Perez-Pedemonti ("Plaintiff"), by and through her undersigned counsel,

The Dugger Law Firm, PLLC, makes the following allegations against Defendant City of New

York ("Defendant City" or "City"), Defendant Joni Kletter ("Defendant Kletter"), Defendant

Sosimo Fabian ("Defendant Fabian"), Defendant Michael Levario ("Defendant Levario")

(collectively, "Defendants") as follows:

<u>**INTRODUCTION**</u>

       1.     This is an action brought by Plaintiff, on an individual basis, against Defendants

for: (1) race (and/or ethnicity and/or ancestry-based) and race-plus gender (and/or ethnicity

and/or ancestry plus gender) discrimination, color discrimination, retaliation, interference with

rights and attempted interference with rights, and aiding and abetting and attempted aiding and

abetting in violation of the New York City Human Rights Law, N.Y.C. Admin. Code §§ 8-101 *et

seq.* ("NYCHRL"); (2) race, ethnicity and/or ancestry discrimination and retaliation in violation

of the 1866 Civil Rights Act, 42 U.S.C. § 1981 ("Section 1981"); (3) retaliation and interference

in violation of the Family and Medical Leave Act, 29 U.S.C. §§ 2601 *et seq.* ("FMLA"); and (4)

retaliation in violation of 42 U.S.C. § 1983 ("Section 1983").

2.      In addition, Plaintiff brings class claims against Defendant City and/or Defendant Fabian for: (1) a pattern, practice, policy, and/or custom of retaliation against employees who made protected Equal Employment Opportunity ("EEO") complaints concerning Commissioners, Agency Heads, and/or EEO Officers that were referred to the New York City Law Department ("Law Department"), pursuant to the NYCHRL and 1981; (2) practices, policies, and/or customs of the Law Department, NYC Department of Citywide Administrative Services ("DCAS"), and/or NYC Equal Employment Practices Commission ("EEPC"), resulting in retaliation, interference with rights and attempted interference with rights, aiding and abetting and attempted aiding and abetting, pursuant to the NYCHRL; and (3) related practices and/or customs of failure to supervise and/or train concerning investigating and/or responding to EEO complaints pursuant to Section 1983.

3.      Plaintiff similarly brings class claims against individual Defendant Fabian concerning his work as the EEO Officer for the Law Department, for interference with rights and attempted interference with rights, aiding and abetting, and attempted aiding and abetting claims, and retaliation pursuant to the NYCHRL.

4.      Plaintiff's class claims against the Defendant City under the NYCHRL, Section 1981, and Section 1983, challenge the Law Department's policies, patterns, and/or practices concerning its investigation of EEO complaints, including NYCHRL aiding and abetting, coercion, interference, and retaliation liability for Defendant City and Fabian, for their failure to meaningfully investigate EEO complaints and/or issuing of *pro forma*, bad faith, and/or pre-determined "unsubstantiated" determinations in response to referred EEO complaints of discrimination and retaliation concerning Commissioners, Agency Heads, and/or EEO Officers.

5.      Plaintiff's class claims against Defendant City under the NYCHRL and/or Section

1983 also include, *inter alia*, (1) DCAS's failure to provide EEO policies that accurately state the prohibitions imposed by the NYCHRL; (2) DCAS's failure to provide a clear standard for determination of whether an EEO complaint is "substantiated"; (3) DCAS's creation of policies that have caused a disparate impact on employees who make EEO complaints against Commissioners, Agency Heads, and/or EEO Officers that are referred to the Law Department; and (4) DCAS's failure to provide adequate training and/or supervision to effectively investigate and/or remedy EEO complaints concerning Commissioners, Agency Heads, and/or EEO Officers.

## <u>JURISDICTION AND VENUE</u>

6.      This Court has jurisdiction over Plaintiff's federal claims pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1343.

7.      This Court has jurisdiction over Plaintiff's NYCHRL claims pursuant to 28 U.S.C. § 1367.

8.      Plaintiff's NYCHRL claims are so closely related to Plaintiff's claims under the FMLA, Section 1981, and Section 1983 that they form part of the same case or controversy under Article III of the United States Constitution.

9.      Defendants are subject to personal jurisdiction in New York.

10.     Venue is proper in the Southern District of New York pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred within this judicial district and Defendants operate their business within this judicial district.

## PARTIES

*Plaintiff Martha Perez-Pedemonti*

11.     Plaintiff Martha Perez-Pedemonti ("Plaintiff") is a brown-skinned Hispanic woman who lived in Long Island City, New York at all times during her employment with Defendant City.

12.     Plaintiff is an attorney admitted and licensed to practice law in New York State since 2013.

13.     Plaintiff was employed by Defendant City in the Mayor's Office of Appointments ("MOA") from October 2018 until her forced resignation on or about January 31, 2020.

14.     At all times relevant to the Class Action Complaint ("Complaint"), Plaintiff held the title Special Counsel and Deputy Director of Vetting within MOA.

15.     At all times relevant to the Complaint, Plaintiff was qualified for the position she held.

16.     At all times relevant to the Complaint, Plaintiff was employed and/or jointly employed by Defendant City, within the meaning of the FMLA, NYCHRL, Section 1981, and Section 1983.

17.     At all times relevant to the Complaint, Plaintiff was a covered employee within the meaning of the FMLA, NYCHRL, Section 1981, and Section 1983.

18.     At all times relevant to the Complaint, Plaintiff was an FMLA "eligible employee" pursuant to 29 U.S.C. § 2611(2) because she had been employed for at least twelve months and worked at least 1,250 hours during the previous twelve-month period, and the total number of employees of the Defendant City was fifty or more employees within seventy-five miles of Plaintiff's worksite.

19.     At all times relevant to the Complaint, Plaintiff had at least one month of FMLA leave remaining, under any calculation of FMLA leave entitlement permitted by 29 C.F.R. § 825.200.

20.     Plaintiff was entitled to FMLA leave for her chronic serious health condition of generalized anxiety and associated panic attacks for which she was receiving continuing treatment pursuant to 29 C.F.R. § 825.115(c) and/or 29 C.F.R. § 825.115(e)(2).

21.     During one or more days, Plaintiff and/or Plaintiff's healthcare provider determined that Plaintiff required leave, including protected FMLA leave, from employment for her chronic serious health condition of generalized anxiety and associated panic attacks and/or her health care provider determined that she needed to be absent from work to receive continuing medical treatment for her chronic serious health condition.

***Defendant City***

22.     Defendant City is a municipal corporation or entity created and authorized under the laws of the State of New York.  Upon information and belief, Defendant City manages and finances its divisions, departments, and/or agencies, including, MOA.

23.     At all times relevant to the Complaint, as well as in the year proceeding such relevant times, the Defendant City employed more than four persons in its employ as employees and/or independent contractors.

24.     Upon information and belief, Defendant City regularly maintained control, oversight, and direction over the operation of its agencies, divisions, and departments, including their employment practices.

25.     The New York City Mayor's Office of Appointments ("MOA"), and/or the Office of the Mayor of which it is a subpart, is a division, department, or agency of Defendant City,

with its headquarters located at 253 Broadway, 5th Floor, New York, New York 10007. According to Defendant City's website, MOA asserts that it is: "[D]edicated to advancing the Mayor's vision of a diverse and inclusive team of senior leaders in city government, and charged with promoting equity, opportunity and excellence in policy making and the delivery of city services.  Working across all city agencies and mayoral offices, MOA serves a critical role by providing talent recruitment and development support for the Administration's senior leadership.  Additionally, MOA advises the Mayor on over 200 boards and commissions that fall under his purview. These boards execute important policy decisions in connection with city infrastructure, culture, and community priorities."[1]

26.     At all times relevant to the complaint, Defendant City employed more than fifty employees within seventy-five miles of Plaintiff's worksite at MOA's principal office.

27.     The New York City Law Department is a division, department, and/or agency of Defendant City that, according to the City's website, "represents the City, the Mayor, other elected officials, and the City's many agencies in all affirmative and defensive civil litigation, as well as juvenile delinquency proceedings brought in Family Court and Administrative Code enforcement proceedings brought in Criminal Court."[2]

28.     Upon information and belief, the Law Department represents the Defendant City in all, or the vast majority of, defensive litigation against the City, including, but not limited to, employment litigation against its City agencies, elected officials, and senior leadership.

29.     Upon information and belief, pursuant to the NYC City Charter Section 394, the City Law Department is counsel for the City and every agency thereof in all, or the vast majority

---

[1]      https://www1.nyc.gov/site/appointments/about/about.page (last visited July 20, 2022).

[2]      https://www1.nyc.gov/site/law/about/about-the-law-department.page (last visited July 20, 222).

of, employment litigation matters.

30.     The Department of Citywide Administrative Services supports the operations of New York City government including the City's EEO policies and training of employees regarding the City's EEO policies.

31.     Upon information and belief, pursuant to the City Charter Section 814(a)(12), DCAS is required to establish uniform procedures and standards to assist City agencies in establishing annual EEO Plans, and other measures and programs to ensure equal employment opportunity.

32.     Upon information and belief, DCAS is required to establish uniform procedures and standards to assist city agencies in instituting annual EEO plans, measures, and programs.

33.     Upon information and belief, NYC City Charter Chapter 35 ascribes EEO-related responsibilities to the DCAS Commissioner and the heads of each City agency.

34.     Upon information and belief, NYC City Charter Chapter 35 and 36 ascribes EEO-related responsibilities to the NYC Equal Employment Practices Commission ("EEPC").

35.     Upon information and belief, DCAS promulgated the 2014 Equal Employment Opportunity Policy: Standards and Procedures to be Utilized by City Agencies, which was in effect and served as Defendant City's EEO policy from 2014 through at least 2020.

36.     Upon information and belief, DCAS implemented an EEO policy during this time that required that EEO complaints be "filed within one year of the event which is the subject of the complaint," despite that NYC municipal law provides a statute of limitations of three years to file an enforcement action.  Accordingly, NYC employees have no available EEO remedy concerning violations of the NYCHRL that occurred between 366 and 1095 days prior to the submission of the EEO complaint.

37.     Upon information and belief, the EEPC is a non-mayoral body empowered by Chapter 36 of the Charter to audit, review, evaluate, and monitor municipal entities once every four (4) years for compliance with the Charter, the City's Human Rights Law, state and federal anti-discrimination laws and regulations, and policies and procedures to increase equal opportunity within municipal employment.

38.     Chapter 36, Sections 830 and 831 and (5) of the NYC Charter authorized and required the EEPC to audit, evaluate and monitor the employment practices, procedures, and programs of City agencies and other municipal entities, and their efforts to ensure fair and effective equal employment opportunities, and to recommend practices, procedures, approaches, measures, standards, and programs to be utilized by such entities for compliance with federal, state, and local laws and regulations, and policies and procedures to increase equal opportunity for women, minorities, and other employees and job applicants identified for protection from discrimination.

39.     The City Charter authorizes and requires the EEPC to review the standards, procedures, and programs established by DCAS regarding EEO for municipal entities, and to audit and evaluate the employment practices and procedures of each City agency at least once every four (4) years and whenever requested by the City Civil Service Commission or City Human Rights Commission, and recommends procedures, standards, and programs for EEO.

40.     Upon information and belief, according to the NYC Charter, EEPC consists of a Board of five (5) per diem Commissioners.  The Board is comprised of two (2) appointees each from the Mayor and New York City Council ("Council"), and a Chair jointly appointed by the Mayor and Speaker of the Council.

41.     Upon information and belief, the EEPC Board of Commissioners performs the

following duties and responsibilities essential to the EEPC's Charter mandates: (1) review and approve the annual audit plan; (2) review the auditing standards used to ensure entities' compliance with the Charter, City Human Rights Law, and other relevant city, state, and federal EEO laws, regulations, procedures and policies; (3) review, approve, and adopt Resolutions pursuant to EEO Program Analysts' findings and issue Final Determinations; (4) review and approve entities' implementation of corrective actions, adopt Determinations of Compliance or Non-Compliance at the end of the Charter mandated compliance-monitoring period, and adopt relevant Resolutions; (5) deliberate on issues and trends of employment practices pursuant to the audit and evaluation of City entities; and (6) publish an annual report to the Mayor and Council on the activities of the EEPC and the effectiveness of each City entity's affirmative employment efforts and the efforts by DCAS to ensure equal employment opportunity for employees and applicants for employment with City government.

42.    Upon information and belief, the purpose of an EEPC audit is to analyze and evaluate a municipal entity's employment practices and EEO Program to ensure that it fulfills the EEO-related responsibilities assigned by the New York City Charter.  The EEPC audit examines a municipal entity's efforts to establish and maintain, *inter alia*, "a firm policy against discriminatory employment practices", "a meaningful and responsive procedure for investigating discrimination complaints," and "a program to educate employees about unlawful discriminatory practices."

43.    Upon information and belief, the EEPC adopted uniform standards to review, evaluate, and monitor municipal entities' employment and EEO-related practices, procedures, approaches, measures, standards, and programs, EEO programs, and policies.

44.    Upon information and belief, the EEPC's EEO Program Analysts review the

complaint and investigation component of a municipal entity's EEO Program to ascertain whether it has established effective and responsive procedures for investigating discrimination complaints.  EEO Program Analysts examine: (1) the number and types of complaints the municipal entity has received; (2) the availability of personnel for complaint intake and investigation; (3) the complaint tracking and monitoring system; (4) documentation of investigations conducted; (5) communications between the municipal entity and parties to a complaint; and (6) the roles and responsibilities of the EEO personnel, Agency Counsel and agency head in the complaint investigation process.

45.    Upon information and belief, after a review and analysis of documents, records, and data, the EEPC issues Preliminary and Final Determinations, which delineate audit findings and corrective actions, if any, a municipal entity should take to achieve compliance with city, state, federal EEO laws, regulations, policies and procedures.

46.    Upon information and belief, unlike the audit protocols for larger governmental units, for the audit protocols for a general employment and EEO program audit of agencies and municipal entities with fewer than 150 employees do <u>not</u> include analysis of discrimination complaint and equal employment-related legal activities or discrimination and sexual harassment complaint and investigation procedures.

47.    A reference to "Defendant City" or "City" in this Complaint encompasses MOA, the Law Department, DCAS, and EEPC, as divisions, departments, and/or agencies of the Defendant City, and any reference to MOA, the Law Department, DCAS, EEPC, and/or any other City agency, division, and/or department is a reference to the "Defendant City" or "City" in this Complaint.

48.    At all times relevant to the Complaint, Defendant City was Plaintiff's employer

and/or joint employer within the meaning of the FMLA, NYCHRL, Section 1981, and Section 1983.

49.     MOA was Plaintiff's employer and/or joint employer within the meaning of the FMLA, NYCHRL, Section 1981, and Section 1983.

50.     Upon information and belief, at all times relevant to the Complaint, Defendant City employed more than 50 employees.

### Defendant Joni Kletter

51.     Defendant Joni Kletter ("Defendant Kletter") was the Director of MOA from April 2018 until she was promoted to Commissioner and Chief Administrative Law Judge for the NYC Office of Administrative Trials and Hearings in or around March 2020.

52.     Defendant Kletter was a senior-level employee of Defendant City and MOA, who was Plaintiff's ultimate superior from October 2018 through January 2020, during which time she controlled the terms and conditions of Plaintiff's employment.

53.     Upon information and belief, Defendant Kletter was the Principal EEO Officer for MOA from October 2018 through January 2020.

54.     Upon information and belief, Defendant Kletter is a Caucasian woman.

55.     Upon information and belief, Kletter stepped down from her current position as Commissioner and Chief Administrative Law Judge for the NYC Office of Administrative Trials and Hearings during April 2022.

### Defendant Michael Levario

56.     Upon information and belief, Defendant Michael Levario ("Defendant Levario") was Senior Counsel and Director of Vetting for MOA.

57.     During Plaintiff's employment with MOA, Defendant Levario was promoted on

at least two occasions within MOA.  Ultimately, Defendant Levario became Plaintiff's supervisor during which time he held supervisory control over Plaintiff and other employees within MOA.

58.     Upon information and belief, one of Defendant Levario's parents is from the country of Spain.

59.     Upon information and belief, Defendant Levario is a light-skinned Caucasian man.

60.     Upon information and belief, in the alternative, Defendant Levario is a light-skinned Caucasian man who sometimes identifies himself as Hispanic based on one of his parents being from Spain.

***Defendant Sosimo Fabian***

61.     At all times relevant to the Complaint, upon information and belief, Defendant Sosimo Fabian ("Defendant Fabian") was Chief Diversity and EEO Officer for the City Law Department.

62.     Upon information and belief, Defendant Fabian conducted the investigation of Plaintiff's EEO complaint and/or authored the letter determination sent to Plaintiff, that the City Law Department had determined that her EEO complaint was "unsubstantiated."

## FACTUAL ALLEGATIONS

63.     Plaintiff graduated from the University of Connecticut School of Law in 2012, and was admitted to practice in New York State in 2013.

64.     In or around October 2018, Plaintiff commenced employment with MOA as Special Counsel and Deputy Director of Vetting.  In her role, Plaintiff directly reported to MOA's Legal Director Schuyler Mapp-Williams ("Legal Director Mapp-Williams") -- a Black

female.

65.     At all relevant times, the Director of MOA was Defendant Kletter -- a Caucasian woman.  At all relevant times, Defendant Kletter was the Principal EEO Officer for MOA.

66.     Upon information and belief, at the time Plaintiff was hired by MOA in October 2018, she was the only Hispanic female attorney working in MOA.

67.     At the time of her hiring, there were approximately five attorneys in MOA, including the following individuals in order of seniority: Defendant Kletter (Director), Joanna Ray (Deputy Director), Legal Director Mapp-Williams (Senior Counsel & Director of Vetting), Plaintiff (Special Counsel & Deputy Director of Vetting), Michael Levario (Special Counsel), and Tawakalitu Amusa (Special Counsel).

68.     In her position as Special Counsel and Deputy Director of Vetting under Legal Director Mapp-Williams, Plaintiff was an integral part of the team.  Among other responsibilities and duties, she collaborated with her colleagues, completed research assignments, and vetted candidates for various roles with the City including, Deputy Mayors, Commissioners, Directors of Boards and Board level candidates, by conducting B-Level and D-Level vets for these positions.  In short, D-Level vets involve confidential generalized background checks of a candidate, including career overview, verifying licenses, lobbying background, internet and social media profiles, criminal, and bankruptcy history.  B-Level vets involve everything involved in a D-Level vet as well as a thorough review of the candidate's academic and career background, written works, public statements, memberships, and personal history.

69.     In her role, Plaintiff was also provided with access to several points of contact throughout the City, including the Department of Investigation ("DOI") and additional Boards. Plaintiff was also responsible for coordinating the hiring of interns for MOA.

*Plaintiff Begins to Witness and Experience Discriminatory Behavior*

70.    Soon after commencing employment with the MOA, in or around the winter of 2018, at a joint Boards & Commissions and Legal Team meeting that Plaintiff attended, Mollie Meikle ("Meikle"), the then Director of Boards & Commissions (a Caucasian woman) looked at Director Kletter in a quizzical manner and told her in a harsh tone that there were "three Muslims" in the roster for the newly created Civic Engagement Commission.  She then asked Director Kletter whether "three Muslims" were "too many," to which Defendant Kletter shockingly responded, "yes," and Defendant Kletter then instructed Meikle *to take two of them out of contention* for the fourteen available positions.  Two of the candidates were immediately removed from the candidate pool, as result of this discriminatory exchange between Defendant Kletter and Meikle.

71.    Plaintiff was stunned at the explicit discriminatory nature of Defendant Kletter and Meikle's decision-making regarding these candidates.  The three Muslim applicants were candidates for a Civic Engagement Commission that had been open for applications to the general public.  Following several rounds of review of about 2,500 candidates, the 2,500 were narrowed to approximately 100 candidates, including these three candidates of the Muslim faith.  No other reason other than these candidates' religion was ever offered by Meikle or Defendant Kletter for removal of two of these Muslim candidates from the candidate pool.

72.    At the time Defendant Kletter made these discriminatory comments she was the EEO Officer for MOA.

73.    At a later similar Board & Commissions and Legal Team meeting, potential board members for a Queens-based cultural center board were discussed.  When a colleague asked Defendant Kletter what kind of member she wanted for the Board, Defendant Kletter responded

by demanding, "we need a Hispanic."  Plaintiff was -- once again -- taken aback by the comment because Defendant Kletter's statement was an explicit race-based and exclusionary hiring criteria, made in front of numerous City employees, including Defendant Kletter's subordinates. An employee responsible for helping to identify and place candidates for all Board & Commissions positions for the City later told Plaintiff that he had approached Defendant Kletter with a potential candidate, and that Defendant Kletter had looked at the candidate and told the employee that the candidate did not look "Hispanic enough" based on the candidate's physical features.

74.     At the time Kletter made these discriminatory comments she was the EEO Officer for MOA.

75.     Beyond these incidents, Plaintiff soon experienced -- or was made aware of -- numerous additional instances of racial discrimination by Defendant Kletter.  These were primarily driven by the fact that Defendant Kletter generally treated non-Caucasians (and/or brown or dark-skinned persons) less well than Caucasians.  For example, Defendant Kletter: (1) typically did not acknowledge or return greetings from non-Caucasians (and/or brown or dark-skinned persons) including Plaintiff; and (2) typically did not look non-Caucasians (and/or brown or dark-skinned persons) in the eye when speaking to them or when they spoke to her.

76.     Kletter also mocked Everardo Jefferson ("Jefferson"), a Latino candidate for the City's Landmarks Preservation Commission, for having a heavy Spanish accent during a mock interview of him to prepare for a City Council hearing.  Jefferson was subsequently confirmed as Commissioner of the City's Landmarks Preservation Commission by the City Council.

***Plaintiff Notices Defendant Kletter's Discriminatory Treatment of Legal Director Mapp-Williams***

77.     Near the end of 2018, Plaintiff also noticed that Defendant Kletter treated Legal Director Mapp-Williams (a Black female), Plaintiff's supervisor at the time, less well than Caucasian employees.  For example, in meetings, Defendant Kletter frequently cut off Legal Director Mapp-Williams (a Black woman) while she was speaking and/or giving her opinion, rolled her eyes when she was speaking to signal she had no regard or respect for what was being said, and/or simply ignored her when she spoke.

78.     Defendant Kletter would also constantly barrage Legal Director Mapp-Williams with questions while she sat at her desk.  Defendant Kletter would hover over her and ask her unexpected questions to which it was unreasonable to have an immediate answer, and then would become visibly angry if Legal Director Mapp-Williams did not have an immediate answer.

79.     Legal Director Mapp-Williams often looked visibly shaken, embarrassed, and humiliated by the discriminatory aggression Defendant Kletter exhibited towards her.

80.     For several months, Plaintiff witnessed Defendant Kletter engage in this inappropriate and discriminatory behavior towards Legal Director Mapp-Williams.

81.     Kletter, repeatedly, intentionally, and unnecessarily humiliated Legal Director Mapp-Williams on an ongoing basis, in front of her subordinates, high-level City managers, and many others.

82.     As Plaintiff increasingly realized that Defendant Kletter did not treat non-Caucasian managers the way she treated Legal Director Mapp-Williams, Plaintiff became quite concerned about the racially hostile environment she was witnessing, and also being subjected to, within just months of her joining MOA.

***Plaintiff Reports Defendant Kletter's Discriminatory Treatment of Legal Director Mapp-Williams***

83.     Meikle and Plaintiff would occasionally go on runs together after work once or twice a month.

84.     In or around early 2019, on approximately the third or fourth run, Plaintiff raised concerns with Meikle about the discriminatory behavior Legal Director Mapp-Williams was being subjected to.  Plaintiff complained to Meikle, and otherwise opposed, Defendant Kletter's racial bias and discriminatory treatment of Legal Director Mapp-Williams.

85.     During one of the later runs, in or around the spring of 2019, Plaintiff also complained to Meikle about (and opposed) the discriminatory exclusion of the two Muslim applicants to the Civic Engagement Commission.  When Plaintiff brought up the concern about the "three Muslims" exchange between Meikle and Defendant Kletter, Meikle seemed surprised and claimed that she did not mean the comment the way it sounded, and then told Plaintiff that she would speak to Defendant Kletter about the incident.  Meikle also attempted to defend Defendant Kletter's treatment of Legal Director Mapp-Williams, although Meikle admitted to Plaintiff that Legal Director Mapp-Williams likely experienced negative treatment at MOA as a Black woman.

86.     Soon thereafter, in or around June 2019, not only did Meikle stop inviting Plaintiff on runs but she also began to ignore Plaintiff in the office, ignore Plaintiff in meetings, and failed to include Plaintiff on assignments relevant to Plaintiff's title.

87.     Upon information and belief, Meikle's discriminatory and/or retaliatory behavior towards Plaintiff escalated after Plaintiff raised concerns about the racially differential treatment she witnessed within MOA.

*Legal Director Mapp-Williams Goes Out on Medical Leave and the Discriminatory Environment Escalates Becoming More Hostile Towards Plaintiff*

88.     In or around the beginning of May 2019, Legal Director Mapp-Williams went out on medical-based FMLA through mid-June 2019.

89.     During Legal Director Mapp-Williams's leave, upon information and belief, Defendant Kletter promoted Defendant Levario -- a Caucasian male and 2016 law graduate *admitted to the New York bar as recently the previous year in 2018*, with substantially less experience than Plaintiff (a 2012 law graduate) -- from Special Counsel to Deputy Director of Research.  Plaintiff was not offered an opportunity to compete for, or even notified of the existence of, this position before it was given to her less experienced Caucasian male co-worker.

90.     Moreover, during Legal Director Mapp-Williams's leave, Defendant Kletter and Deputy Director of MOA Joanna Ray ("Deputy Director Ray") authorized Defendant Levario to take over for Legal Director Mapp-Williams and manage her team, including Plaintiff, even though Plaintiff was a more experienced attorney than Defendant Levario.

91.     In the leadership vacuum left by Legal Director Mapp-Williams's temporary departure, and with Defendant Levario unable to perform at the same or similar level as Legal Director Mapp-Williams, the performance of the MOA almost immediately declined.

92.     Initially, during the first week of Legal Director Mapp-Williams's leave, Plaintiff and Defendant Levario were both assigned to review all D-Level candidates.  Plaintiff successfully completed the work and did not receive any negative feedback.

93.     Approximately a little more than one week later, on or about May 30, 2019, during a legal team meeting, Plaintiff was blindsided when Deputy Director Ray publicly announced that Plaintiff's D-Level review work was being taken away from her and being assigned *only* to Defendant Levario.  Defendant Kletter nodded in approval of this

announcement.  No explanation was provided for this materially adverse change to Plaintiff's

duties and/or job description.  Upon information and belief, Plaintiff's duties reviewing D-Level

candidates were transferred to Defendant Levario.

94.     Taken aback by the announcement, Plaintiff approached Deputy Director Ray and

inquired about why this decision was made -- particularly given that she had not received any

negative feedback on the work she was assigned.  Deputy Director Ray responded by telling

Plaintiff that she made the change after Defendant Levario requested the change and that she

decided to leave Defendant Levario in charge of all D-Levels until Legal Director Mapp-

Williams returned.

95.     Plaintiff was surprised that Deputy Director Ray would place Defendant Levario -

- who had less experience than Plaintiff -- in charge of all D-Levels instead of her simply upon

his request.

96.     Concerned that she was being unfairly passed over for a professional growth

opportunity, Plaintiff informed Deputy Director Ray that she too wanted to be given the

opportunity to develop professionally by continuing to do final review of D-Levels.  Ignoring

Plaintiff's concern, Deputy Director Ray insisted it was just temporary, and would be revisited

when Legal Director Mapp-Williams returned to the office.

97.     Plaintiff, however, was never allowed to be the final reviewer for D-Levels or B-

Levels vets again after this conversation, except for one week at the end of the year when

Defendant Levario was out of the office.  Initially, her immediate supervisor did so (Legal

Director Mapp-Williams), and then Defendant Levario (who had less legal experience than

Plaintiff) reviewed her work.

***Defendant Levario Becomes Visibly Angry with Plaintiff for Expressing Her Opinions about an Intern Candidate***

98.     Moreover, during Legal Director Mapp-Williams's leave, Legal was tasked with interviewing candidates for summer and fall legal intern positions.  Subsequent to interviewing one candidate, Defendant Levario, Plaintiff, and two other women of color on the team held a meeting to discuss an interviewee.  Defendant Levario really liked the candidate while Plaintiff and the other women expressed reservations.

99.     As Plaintiff voiced and detailed her perspective about why the candidate might not be a good fit, Defendant Levario became visibly upset and angry with Plaintiff for holding a different opinion.  Defendant Levario failed to make eye contact (staring directly at the middle of the table) with Plaintiff while she spoke, his jaw clenched, and his complexion turned pink from anger.

***Plaintiff Reports Discrimination/Retaliation to Deputy Director Ray***

100.     On or about June 27, 2019, Plaintiff met with Deputy Director Ray and expressed her concerns about racial bias in the MOA.  She reminded Deputy Director Ray of the "too many Muslims comment" made by Meikle, and acted on by Defendant Kletter, to remove Muslims from consideration.

101.     Deputy Director Ray, who was present when the comment was made, admitted the comment was problematic.

102.     Plaintiff also reported that the treatment of Legal Director Mapp-Wiliams was discriminatory and explained to Deputy Director Ray that she was concerned that Defendant Levario was being treated as more senior to Plaintiff even though Plaintiff's title was higher than his.  Plaintiff then requested a job description -- for her apparently modified position -- from Deputy Director Ray because of her concern.

103.     In response, even though many of Plaintiff's complaints were about Defendant Kletter, Deputy Director Ray informed Plaintiff that she would raise Plaintiff's concerns to Defendant Kletter.

104.     Deputy Director Ray also told Plaintiff that she would send Plaintiff a job description, but she never did so.

105.     Shortly thereafter, Deputy Director Ray left MOA.

***Legal Director Mapp-Williams Returns and Three Non-Caucasian Employees, Including Plaintiff, Raise Concerns about the Discriminatory Treatment They Endured During Her Leave***

106.     When Legal Director Mapp-Williams returned to the office from her protected FMLA leave during approximately mid-to-late June 2019, MOA's performance quickly returned to its previous levels.

107.     Upon her return, Plaintiff and her colleagues Jane Doe One and Jane Doe Two -- all of whom were non-Caucasian women of color -- brought to Legal Director Mapp-Williams some of the issues that had occurred regarding Defendant Levario's and/or MOA's less well discriminatory treatment of them while she was on leave.

108.     For example, they complained about Defendant Levario: (1) stepping into Legal Director Mapp-Williams's position during her absence over other eligible candidates; (2) taking work away from Plaintiff; and (3) acting condescendingly towards Jane Doe One and Jane Doe Two.  They also complained about Defendant Levario simply failing to be an effective manager.

109.     Taking their concerns seriously, on or around July 23, 2019, Legal Director Mapp-Williams initially met with Defendant Levario and Deputy Director Ray to ascertain what occurred on the team in her absence.  During the meeting, which occurred in a conference room encircled by Plaintiff and her co-workers' desks, Plaintiff initially heard shouting that eventually

21

gave way to hearing Legal Director Mapp-Williams not merely crying -- *but wailing* -- for a number of minutes near the conclusion of the meeting.

110.    Upon information and belief, Director Kletter joined the meeting, and shortly after she joined, Defendant Levario left the meeting.

111.    After the meeting concluded, Legal Director Mapp-Williams told Plaintiff and the rest of her team that she was leaving for the day.  Plaintiff walked her out of the office out of concern.

112.    Once outside, a visibly shaken Legal Director Mapp-Williams told Plaintiff that after she gave Defendant Levario -- her subordinate -- feedback about his performance and the issues that had been raised regarding his treatment of his non-Caucasian female co-workers, Defendant *Levario screamed at her that she was a "failure,"* for whom he had "no respect," <u>*because*</u> *she had taken FMLA leave*.

113.    Defendant Levario, in a further reference to Legal Director Mapp-Williams's leave and/or the underlying, upon information and belief, health-based reasons for her use of FMLA leave, also screamed that he was tired of Legal Director Mapp-Williams's "problems."

114.    Deputy Director Ray and Director Kletter were either present for and/or immediately informed of Defendant Levario's behavior during the meeting with Legal Director Mapp-Williams.

115.    Upon information and belief, Defendant Levario was not written up or otherwise disciplined for the -- *quite extraordinary* -- insubordinate behavior of screaming at his direct supervisor Legal Director Mapp-Williams.

116.    Later that day, and as a result of the above-described discrimination and retaliation, Plaintiff suffered a severe panic attack at work.

***Plaintiff Is Warned to Distance Herself From Her Supervisor***

117.    A few days later, during one of their last runs together, Plaintiff and Meikle spoke briefly about the recent events involving Legal Director Mapp-Williams.

118.    Meikle warned Plaintiff to be "careful" not to appear "too close or supportive" of Legal Director Mapp-Williams (who had just raised Plaintiff's discrimination concerns regarding Defendant Levario both directly to management and Defendant Levario).  Specifically, Meikle stated that, while walking with Legal Director Mapp-Williams out of the office was the "humane" thing to do, Plaintiff ***should not*** do it again in front of Defendant Kletter -- implying that if she associated herself or showed support for Legal Director Mapp-Williams she would likely be subject to retaliation from Defendant Kletter.

119.    Defendant Kletter was the EEO Officer for MOA at this time.

***MOA's Leadership Subjects Legal Director Mapp-Williams to Increased Discriminatory and Retaliatory Conduct Forcing Her to Transfer Out of MOA***

120.    Following Defendant Levario's insubordination towards Legal Director Mapp-Williams, MOA's leadership subjected Legal Director Mapp-Williams to even worse discriminatory and/or retaliatory conduct.

121.    Among other things, MOA's leadership froze Legal Director Mapp-Williams out as a leader.  For example, Defendant Kletter dismissed even simple questions Legal Director Mapp-Williams asked that required answers for the team to complete assignments.  Defendant Kletter also became otherwise uncooperative in providing even the most basic information for Legal Director Mapp-Williams's team in response to requests from Legal Director Mapp-Williams.

122.    Moreover, during July 2019, within less than a month of Legal Director Mapp-Williams's return from FMLA leave from the MOA, and in retaliation for Mapp-Williams's use

of FMLA leave and her opposition to racial discrimination within MOA, Defendant Kletter,

Deputy Director Ray, and Defendant Levario stripped her of almost all her authority.

123.    For example, suddenly, and without any explanation to her team, Legal Director

Mapp-Williams was no longer allowed to have meetings alone with her team.  Instead, Deputy

Director Ray was required to sit in on all of her meetings.  For example, on or about July 23,

2019, when Legal Director Mapp-Williams held a meeting with Plaintiff, Jane Doe One, and

Jane Doe Two, Deputy Director Ray ran into the room to ask what the group had been discussing

and immediately emailed Legal Director Mapp-Williams demanding detailed notes from the

meeting.

124.    Soon thereafter, in or around mid-August 2019, it was announced that Legal

Director Mapp-Williams would be transferring out of MOA to the City's Department of

Information ("DoITT").

125.    Upon information and belief, Legal Director Mapp-Williams was ultimately

forced out of MOA because of senior leadership's ongoing and relentless discriminatory and/or

retaliatory conduct.

***Defendant Kletter and Deputy Director Ray Strategically and Unenthusiastically Symbolically
Inquire of Plaintiff's Interest in the Legal Director Position***

126.    On or about August 24, 2019, shortly after the announcement was made that

Legal Director Mapp-Williams would be leaving MOA, Defendant Kletter and Deputy Director

Ray called Plaintiff into a meeting.

127.    Defendant Kletter told Plaintiff that the office was attempting to reconfigure the

team given Legal Director Mapp-Williams's departure.  In an unenthusiastic tone, that suggested

it was an empty gesture that demonstrated no confidence in Plaintiff, Defendant Kletter asked

Plaintiff, "do you feel comfortable stepping into [Legal Director Mapp Williams's] shoes."

128.     Because she witnessed Defendant Kletter and MOA's senior leadership relentlessly discriminate and retaliate against Legal Director Mapp-Williams and others, including herself, Plaintiff was extremely concerned to take on the role and expose herself to even more discriminatory and retaliatory animus.  In fact, upon information and belief, Defendant Kletter seemingly was actively trying to elicit a "no" response from Plaintiff.

129.     As a result, Plaintiff simply confirmed what Defendant Kletter wanted to hear, by stating her lack of comfort stepping into the role.

130.     Plaintiff only declined to express interest in the role because of fear of further retaliation and discrimination if she indicated her interest in the role.

131.     Instead of encouraging Plaintiff to take on the position by offering her support and encouraging her, and in an apparent attempt to completely dissuade Plaintiff from expressing interest in the role, Defendant Kletter quickly told Plaintiff that it made sense and then proceeded to diminish Plaintiff's intelligence.

132.     For example, Defendant Kletter told her "[T]he NYCHA work [Defendant Levario] was working on a few weeks ago was *too difficult* for you." (emphasis added).

133.     Yet Plaintiff had never been asked nor given the option to work on the NYCHA project that Defendant Kletter was comfortable assuming was "too difficult" for her.

134.     Then, as if to imply that Plaintiff was not working hard, Defendant Kletter said, in an accusatory tone, "people are going to have to step up."

135.     While, at the end of the meeting, Plaintiff expressed her commitment to ensure that the team succeeded, Defendant Kletter had made it clear to Plaintiff during their meeting that she did not want Plaintiff in the role.

136.     Absent these discriminatory and retaliatory practices by MOA's senior leadership,

Plaintiff would have expressed interest in the position.

137.     Upon information and belief, the Legal Director position would have increased Plaintiff's salary and/or fringe benefits.

138.     During August 2019, Plaintiff's panic attacks caused by the discrimination and retaliation in the workplace intensified.

***Defendant Kletter Informs Plaintiff that Defendant Levario Was Promoted to Legal Director and Defendant Kletter Ignores Plaintiff's Concerns***

139.     After returning from a short vacation on September 9, 2019, Plaintiff expected to find Legal Director Mapp-Williams working her last week with MOA before her transfer. Instead, in the interim, upon information and belief, Defendant Kletter allegedly contacted Legal Director Mapp-Williams's future boss in the DoITT and successfully requested that Mapp-Williams's transfer start date be expedited.

140.     Upon Plaintiff's return from vacation, Defendant Kletter informed Plaintiff that Defendant Levario had received the promotion to Legal Director in former Legal Director Mapp-Williams's place.

141.     Shocked by the news, given Defendant Levario's lack of experience as an attorney and his prior discriminatory conduct, Plaintiff responded by noting her disapproval of this decision.

142.     Plaintiff informed Defendant Kletter that: (1) Defendant Levario was abusive; (2) Defendant Levario had screamed at his Black female supervisor Legal Director Mapp-Williams, which suggested his treatment of his new subordinates (all women of color) would be even more extreme; (3) Defendant Levario seemed unable to receive any feedback from her or other women of color without becoming visibly enraged with a clenched jaw and red face; and (4) she did not want to work in a racially hostile work environment with Defendant Levario.

143.    Plaintiff explicitly framed Defendant Levario's conduct as race-based micro and macroaggressions towards Legal Director Mapp-Williams and other women of color in the unit -- including herself.

144.    Defendant Kletter, apparently surprised that Plaintiff was aware of Defendant Levario's abusive, insubordinate, and discriminatory treatment of Legal Director Mapp-Williams in their "closed-door" meeting, nonetheless defended his insubordination and dismissed Plaintiff's concerns and race-based complaint.

145.    In fact, Defendant Kletter went so far as *to blame Legal Director Mapp-Williams* for Defendant Levario's screaming at her by asserting that Legal Director Mapp-Williams had (somehow) "pushed" her subordinate Defendant Levario -- to scream at her.  Defendant Kletter then directly stated to Plaintiff that she had considered Legal Director Mapp-Williams's *use of FMLA leave an "act of insubordination.*"

146.    At the time Defendant Kletter engaged in this conduct she was the EEO Officer for MOA.

147.    Upon information and belief, Kletter did not treat any of Plaintiff's discrimination complaints as EEO complaints and did not take any action to address them through Defendant City's EEO process.

148.    Subsequent to this meeting, MOA staff, including Plaintiff, were pulled into a meeting where Defendant Kletter announced to the MOA team that Defendant Levario was the new Legal Director of MOA.  Defendant Kletter then said, to a staff primarily made up of women of color, "[maybe] we need a man in leadership."

149.    Defendant Kletter also announced that Deputy Director Ray was leaving MOA for another job opportunity.

*Defendant Kletter Threatens Plaintiff*

150.   On or about September 12, 2019, Plaintiff met former Legal Director Mapp-Williams for lunch and relayed to her that Defendant Kletter had said her use of protected FMLA leave had been "insubordination."  When former Legal Director Mapp-Williams asked whether she could report this information to human resources, Plaintiff agreed but asked, out of fear of retaliation, that she not be identified as the source of the comment.

151.   Four days later, on or about September 16, 2019, Defendant Kletter walked into a team meeting, looked directly at Plaintiff, and upon belief, to signal that she knew about Plaintiff's disclosure of her statement that Mapp-Williams using protected FMLA leave had been "insubordinate," sarcastically asked how former Legal Director Mapp-Williams was doing. Upon information and belief, this was an implicit threat of retaliation.

152.   At the time Defendant Kletter engaged in this conduct she was the EEO Officer for MOA.

*The MOA Further Deteriorates Under Defendant Levario's Management*

153.   In or around September 2019, soon after Defendant Levario took over control and management as Legal Director, MOA began to rapidly deteriorate.

154.   Under Defendant Levario's management, among other things: (1) legal research questions were not fully researched and answered; (2) Defendant Levario frequently incorrectly -- both substantively and editorially -- edited documents; and (3) Defendant Levario unilaterally changed the result of candidates' vets.

155.   For example, on or about October 18, 2019, Defendant Levario erroneously removed a substantive flag Plaintiff had included in her original vet.  On or about November 19, 2019, this error was subsequently reported to Defendant Kletter by the Mayor's Chief of Staff,

who relayed the information to Defendant Levario and Plaintiff.  In response, Plaintiff explained that she included the flag in her original vet, but that Defendant Levario -- her supervisor -- had edited it out.

156.    In stark contrast to how she would have treated former Legal Director Mapp-Williams for a similarly egregious error, and without acknowledging Defendant Levario's error, Defendant Kletter said only, "[l]et's make sure we're catching these flags before it goes to the Mayor . . . ."

157.    Upon information and belief, Defendant Levario was never disciplined for nor even asked to address this error.

***Defendants' Discriminatory and Retaliatory Conduct Toward Plaintiff Escalates***

158.    Following Legal Director Mapp-Williams's departure from MOA, Defendant Levario -- who now directly managed and supervised Plaintiff -- began: (1) hyper-scrutinizing Plaintiff's movements within the office; (2) taking away her high-level work; and (3) giving her untenable deadlines for her work (*i.e.*, giving her one day to complete a D-Level candidate vet that would normally take 2-4 days).

159.    Simultaneously, Defendant Kletter stopped providing Plaintiff with critical information required for her to do her work.

160.    As set forth below, these changes to the terms and conditions of Plaintiff's work happened so quickly, and were so dramatic, that Plaintiff directly asked Defendant Kletter if her job had changed and if she could receive an updated job description.  Defendant Kletter never responded to this inquiry.

161.    For example, on or about September 16, 2019, Plaintiff worked until approximately 8:30 p.m. completing a D-Level vet, which allowed her colleague to work and

complete another D-Level vet.  This work was well within Plaintiff's scope of work duties as the Deputy Director of Vetting and was work she had previously completed without having to seek permission.  Therefore, Plaintiff was stunned when Defendant Levario -- her Caucasian male and/or light-skinned male supervisor -- brought her into a meeting room the next morning, on or about September 17, 2019, and reprimanded her for working on a D-Level vet.

162.     Visibly angry, not making eye contact with Plaintiff, and with a clenched jaw, Defendant Levario, in an angry, threatening, loud, and forceful tone said, "ask me before you work on another D-Level."  When Plaintiff asked for clarification on why she needed permission to do her job as the Deputy Director of Vetting, given that it was work she had done in the past, Defendant Levario became incensed and said, in a threatening and loud tone (almost screaming at her) "I am the Director."

163.     Because Plaintiff was concerned that her job responsibilities were being taken away from her and/or changed without an explanation, she asked him twice to put his position in writing -- but he refused.

164.     Because Defendant Levario refused to place anything in writing regarding his new work demands on Plaintiff, Plaintiff immediately emailed Defendant Levario a high-level summary of what transpired (copying Defendant Kletter).  Plaintiff was concerned that her job duties were being stripped and sought confirmation about what was expected of her and how (and if) her job duties were being changed.

165.     In the email, Plaintiff asked Defendant Levario for a written-out description of job duties.  She never received the requested document from Defendant Levario.

166.     That same day, Defendant Kletter met with Plaintiff and Plaintiff reported what had occurred to her earlier that morning.  Defendant Kletter (a Caucasian woman), however, yet

again, defended and excused Defendant Levario's (a Caucasian male's and/or light-skinned male's) behavior by explaining that he was a "new manager."  Defendant Kletter also attempted to brush off Plaintiff's concern simply as a miscommunication.  Kletter again ignored Plaintiff's concern and failed to acknowledge the severity of the unfair reprimand for simply doing her job.

167.    Upon information and belief, Defendant Kletter protected and/or credited Defendant Levario, at least in part, because he is Caucasian and/or light-skinned and/or a Caucasian male and/or light-skinned male, and dismissed, and did not credit Plaintiff's concerns and complaint, at least in part, because she is Hispanic and/or a Hispanic woman (and/or a brown-skinned and/or a brown-skinned woman).

168.    During the meeting, Plaintiff also requested that Defendant Kletter provide her with a written description of her job duties because she needed to know in writing if her duties were being changed.  Defendant Kletter never provided Plaintiff with her job duties, and Defendant Levario and Defendant Kletter subsequently continued to strip Plaintiff of her duties throughout the duration of her employment.

169.    Later that day, seemingly after Defendant Kletter had time to ensure Defendant Levario was clear on the "messaging," Defendant Levario and Defendant Kletter met with Plaintiff.

170.    Again, Defendant Kletter attempted to explain away the situation simply as a miscommunication.

171.    By approximately end of September through October 2019, Plaintiff had been all but frozen out of her former position as Deputy Director of Vetting.  Among other things, Plaintiff was no longer given updates on high-level projects, team decisions were no longer made collaboratively, and her suggestions were never considered.

172.    In addition, Plaintiff was given various untenable same-day deadlines.

173.    Additionally, the Research Manager -- a lower position -- began receiving higher-level assignments than Plaintiff.

***Former NYC Mayor de Blasio Calls Defendant Kletter to Praise Plaintiff and Her Colleague, Another Woman of Color***

174.    On or around September 26, 2019, Plaintiff and her colleague (Jane Doe One -- a woman of color) met former NYC Mayor Bill de Blasio ("Mayor de Blasio") at a City Hall event.

175.    The same day, on or around September 26, 2019, the former Mayor, who was apparently very impressed by Plaintiff and her colleague, called Defendant Kletter to inform her of the same.  When she got off the telephone with Mayor de Blasio, as if amused, Defendant Kletter verbally informed Meikle and Defendant Levario of the Mayor's positive feedback about the women.  Defendant Kletter, however, did not verbally communicate the message of the Mayor's praise directly to Plaintiff even though Plaintiff was obviously in earshot.

176.    Upon information and belief, Defendant Kletter did not want to personally convey praise to Plaintiff.  Instead, Defendant Kletter sent Plaintiff and the other women an impersonal one-line email informing them of the former Mayor's praise.

***Defendant Kletter Imitates Stereotypical Black Urban Vernacular***

177.    On or around October 8, 2019, at a Boards & Commissions, Legal Team, and Staff meeting, a Boards & Commissions manager was speaking about needing a Department of Investigation ("DOI") letter so that a board member could be appointed quickly.  Meikle added that it would be important to have the letter "to make sure that [the candidate] is not . . ."  As Meikle was in mid-sentence, Defendant Kletter interrupted Meikle, stating "a murda!"  Instead of saying "murderer" and in an apparent attempt to elicit a reaction, Defendant Kletter used

stereotypical Black urban vernacular (seemingly imitating Ja-Rule, a Black rapper) by stating "murda."

178.    While Caucasian employees in attendance laughed, **none** of the employees of color, including Plaintiff, laughed or said anything at all in response as they were **all** visibly uncomfortable with her disparaging use of black vernacular and imitation of what she perceived to be a stereotypical black voice.

***A Colleague Reports to Plaintiff that Defendant Levario Sexually Harassed Her***

179.    On or about October 24, 2019, Plaintiff received a text from a co-worker (a Hispanic woman) complaining about sexually harassing conduct by Defendant Levario.  The allegations in the text were subsequently corroborated by an additional employee witness.

180.    As background, Defendant Levario had allegedly begun making comments about this female employee's physical appearance by way of references to pictures she posted on her personal social media page.  Defendant Levario also allegedly required this Hispanic female employee to supplicate herself by repeatedly instructing her to, and requiring her to, ask "nicely" for any information from him that she needed to do her job.  Upon information and belief, Defendant Levario did not impose the requirement to ask "nicely" on Caucasians and/or Caucasian men at MOA and/or in his interactions with other offices.

181.    Against this backdrop, Plaintiff and another colleague were informed by the Hispanic woman complaining of harassment that, on or about the evening of October 24, 2019, Defendant Levario loitered around her desk and started making comments about costumes. According to the employee complaining, he then *began ogling the female employee's body for several minutes as she bent down and gathered her things to leave the office*.  They were also informed by her that another employee had witnessed it.

182.     The next day the employee that witnessed the harassment also reported it to Plaintiff.

183.     Later the same day, at least in part because of these events, Plaintiff fought off a panic attack.

184.     Plaintiff was senior in hierarchy to the employee who complained about sexual harassment, the colleague who witnessed the situation, and the other colleague who the alleged victim told of the harassment.

185.     Coincidentally, the next day, on or around October 25, 2019, and subsequent to meeting with Shammiek Barat as noted below, Plaintiff took a previously scheduled required sexual harassment training course.  This course made clear to her that she was obligated to report the sexual harassment complaint she had recently received to management.

***Defendants Attempt to Avoid Plaintiff Making a Formal Complaint by Offering Mediation***

186.     On or about October 25, 2019, upon information and belief, at Defendant Kletter's direction, Shammeik Barat ("Barat"), the Associate Director of Outreach and Talent Development who held a more senior level position than Plaintiff, asked to have coffee with Plaintiff at the Five and Dime.

187.     Upon information and belief, Defendant Kletter asked Barat -- a Hispanic woman in a senior position -- to attempt to forestall a more "formal" complaint of discrimination by Plaintiff against Defendant Levario and/or Defendant Kletter.

188.     Barat told Plaintiff that she asked to meet with her because she wanted to know how things were going with Defendant Levario as her supervisor.  At first, thinking Barat was genuinely concerned about her and hoping that she might be able to assist Plaintiff, Plaintiff responded candidly.  She recounted Defendant Levario's discriminatory and/or retaliatory

treatment of her and others, including his abusive conduct towards her and former Legal Director Mapp-Williams.  Plaintiff further explained that since former Legal Director Mapp-Williams's departure, Plaintiff has been stripped of certain higher-level work duties and subjected to unreasonable deadlines.  Plaintiff then highlighted she was being supervised by Defendant Levario, who lacked legal experience as a person only two years out of law school and just admitted to the bar, and detailed concerns about the office committing malpractice because of his legal errors and oversights.  Plaintiff explicitly told Barat that she was being singled out and felt like she was working in a "hostile work environment."  Among things, she shared that Defendant Kletter's elevation of Defendant Levario to Legal Director, and her supervisor, was tacit approval of his behavior.

189.    During their meeting, Plaintiff was somewhat taken off guard when Barat suggested a mediation between only Defendant Levario and Plaintiff -- but excluding Defendant Kletter.  This communicated to Plaintiff, that the meeting had been an attempt by Barat, to attempt to frame the problems in the office as being unrelated to Defendant Kletter's discriminatory and/or retaliatory conduct.

190.    Upon information and belief, Barat was instructed to message the issues as mere interpersonal isolated issues between Plaintiff and Defendant Levario and/or a conflict in which Plaintiff was the "problem."

191.    In fact, Barat also tried to justify Defendant Levario's behavior by attempting to convince Plaintiff that she was hired under former Legal Director Mapp-Williams and that the work dynamics had been different -- implying yet again -- that there was merely an interpersonal issue.  Plaintiff agreed that the work dynamics were different, however, told Barat that her job responsibilities should not have changed.

192.     When Barat attempted to convince Plaintiff to go to mediation with only Defendant Levario, Plaintiff expressed that she thought the entire team could potentially benefit from mediation and tried her best to explain to Barat that the issue *was not* merely an interpersonal issue.

193.     Barat concluded by telling Plaintiff that she would report what she said to management, that Plaintiff told her "a lot of big stuff," and that she would be meeting Defendant Kletter to inform her of some of the information.  She noted, however, that she could not ensure a change in dynamics with Defendant Kletter.

194.     Despite Plaintiff being confused as to why Defendant Kletter was going to be informed, when Plaintiff was raising concerns that were inclusive of Defendant Kletter's conduct, she did not object to this information being relayed to Defendant Kletter.  Plaintiff diplomatically told Barat that would be happy to have a conversation with Defendant Kletter for the sake of "improving communication and turning a page."  However, in no uncertain terms, Plaintiff then explicitly told Barat *that she was afraid of <u>retaliation</u>*.

195.     Nonetheless, despite everything Plaintiff had reported, including retaliatory behavior that she was already being subjected to, Barat minimized Plaintiff's fear of retaliation. Barat stated unequivocally that she should not be concerned about retaliation because MOA "does not experience retaliation."

196.     Plaintiff, yet again, reiterated her significant concern that she would indeed be subjected to retaliation because of her complaints concerning Defendant Levario and/or Defendant Kletter.

197.     In response, when Barat asked Plaintiff to advise her if she felt retaliated against by getting less work, Plaintiff immediately reiterated that she was *already getting less work*.

198.    This was an additional protected complaint of retaliation.

199.    At that point, worried that Barat was not understanding the gravity of the discriminatory and retaliatory situation, Plaintiff explicitly raised several points with Barat. Specifically, Plaintiff stated, *inter alia*, that Hispanic women like herself were subjected at MOA to various discriminatory tropes and stereotypes that made working at MOA more challenging for Hispanic women.  These tropes included Hispanic women being seen as "uncooperative" or "aggressive" when they were in fact merely being professionally assertive or firm in their work and/or role(s).

200.    Following the meeting with Barat, Plaintiff experienced numerous physical symptoms of stress and/or emotional distress, including, without limitation, a fast heart rate, anxiety, and difficulty concentrating.

***Plaintiff Asks Defendant Kletter for Advice about Whether She Was Required to Report the Alleged Sexual Harassment and Defendant Kletter Proceeds to Humiliate Her for Complying with her Reporting Obligations***

201.    On October 29, 2019, having essentially determined that, based on her recent required sexual harassment training, she had a reporting obligation regarding the recent sexual harassment complaint, Plaintiff (who was the third most senior attorney in MOA by title) emailed Defendant Kletter a general description of the complaint and asked for guidance on whether it was reportable:

> Hi Joni,
>
> I am reaching out because after taking the sexual harassment training this past Friday evening – I realized that last week I was told about an incident between a supervisor and a subordinate that I think could amount to sexual harassment, as described in the training. A summary of some of the incident described to me is as follows:
>
> Last week a colleague informed me that during the evening hours, their supervisor stopped by their desk to make small talk as they (the

colleague) packed their bag to leave. The colleague informed me that while they packed their back, the supervisor stood watching them pack the bag in a manner that made them feel as if their body was being ogled. The supervisor also asked questions about the contents of the items the colleague was placing into their bag. The colleague informs me that another colleague was in the vicinity when the incident occurred and inquired about the situation, as it made them uncomfortable as well. The colleague has told me that this is not the first time the supervisor makes them feel this way.

My question is, as our director and the EEO officer, do agree that this qualifies as reportable harassment? If so, who should I report to?

202.    Instead of responding to her email by scheduling a time to speak with Plaintiff, Defendant Kletter -- the EEO officer for MOA --  sprung a request to meet with her in front of all staff at the end of a subsequent general staff meeting.

203.    This public and sudden request by Kletter to meet with Plaintiff likely suggested to Plaintiff's co-workers that Plaintiff was in trouble with Defendant Kletter.

204.    Defendant Kletter then called EEO representative and Associate Counsel for the Mayor's Office Dustin Saldarriaga ("Saldarriaga") and stated condescendingly: "Martha here took a training last week and now thinks she might have to report something."  Plaintiff was then instructed to recount what she had written to Defendant Kletter concerning the complaint.

205.    Following the meeting, Saldarriaga apologized to Plaintiff -- who was visibly shaken and crying -- for Defendant Kletter's behavior and confirmed that Defendant Kletter had not followed protocol concerning the complaint by springing the meeting about the complaint on her.  Plaintiff was extremely anxious after the meeting and spent over an hour trying to fight off an anxiety attack.

206.    Subsequent to Plaintiff reporting the sexual harassment allegation against Defendant Levario, Defendant Kletter and Defendant Levario, in sum and substance, told

Plaintiff that she was no longer permitted to attend meetings related to her job duties with a sister agency.

207.    On or about October 30, 2019, the female employee who had originally complained about Defendant Levario's sexual harassment was instructed to meet with him – alone -- in a room to make a conference call.  Not surprisingly, the employee was not comfortable with this request and asked for Plaintiff to join the meeting with her.  Indeed, this meeting actually concerned a vetting-related topic that Plaintiff should have been otherwise privy to as Deputy Director of Vetting.

208.    Upon Plaintiff's arrival for this meeting with Defendant Levario's sexual harassment accuser, Defendant Levario claimed that Plaintiff needed to get an ambiguous "clearance" from Defendant Kletter to attend the meeting.

209.    When Plaintiff emailed Defendant Kletter for this ambiguous "clearance," Defendant Kletter told her that Defendant Levario had asked to have these types of calls alone and that she was backing his decision to do so.

210.    Notably, this decision by Defendant Kletter and Defendant Levario was made during an active investigation into the accuser's allegations, leaving the female Hispanic woman who had complained in a very vulnerable position in the midst of investigation into her superior.

211.    Upon information and belief, this woman's concerns were dismissed by senior leadership in MOA because Defendant Levario is a Caucasian male (and/or light-skinned male) and the woman who raised concerns about his harassment of her was a non-Caucasian woman (and/or brown-skinned woman).

212.    The female Hispanic employee who had reported that she had been sexually ogled by Defendant Levario was later informed that her sexual harassment complaint had been

determined to be "unfounded" by the Mayor's counsel's office.

213.    Upon information and belief, she continued to be directly supervised by
Defendant Levario.

***Plaintiff Reports Discrimination and Retaliation to Defendants' Human Resources***

214.    On or about October 30, 2019, Plaintiff reached out to Defendants' Human
Resources about the ongoing discriminatory and retaliatory issues she was experiencing.  In an
email, Plaintiff stated in-part: "I hope this message finds you well.  I am wondering if you could
kindly direct me to whom I can talk about *ongoing bias concerns* I have in my office (Mayor's
Office of Appointments) – I specifically feel that I am being targeted.  I am also wondering
whom I could *speak to about taking FMLA leave*."  (emphasis added).

215.    This email was a protected complaint of discrimination and a protected request for
and/or attempted request for FMLA leave.

216.    On or about October 31, 2019, Plaintiff met with the Office of the Mayor's
Human Resources Manager Kevern Anderson ("Anderson") about her complaints concerning
Defendants Levario and Kletter.  Lakisha Grant ("Grant"), Anderson's supervisor at the time,
was also present during the meeting.

217.    Specifically, Plaintiff reiterated her complaints to Anderson concerning: (1) a
culture of racial and ethnic discrimination at MOA, including Defendant Kletter's and Defendant
Levario's discrimination and retaliation against non-Caucasians (including the discriminatory
treatment of former Legal Director Mapp-Williams and Plaintiff); (2) Defendant Kletter's FMLA
discrimination and retaliation against former Legal Director Mapp-Williams, including her
characterization of protected requests for FMLA leave constituting "insubordination" and her
subsequent retaliation against Plaintiff after Human Resources was notified of the

"insubordination" comment by former Legal Director Mapp-Williams; and (3) Defendant

Kletter's, *i.e.,* MOA's EEO Officer's, failure to appropriately respond to the sexual harassment

complaint against Defendant Levario.

218.    Anderson: (1) acknowledged that Plaintiff had been subjected to a demotion; (2)

noted that the Mayor's Office had received complaints about MOA before and was aware of the

issues relating to Defendant Kletter.  Grant seconded everything Anderson said.  In addition,

Grant suggested that Plaintiff ask Defendant Kletter if she could "get her job back."

219.    On October 31, 2019, Plaintiff followed up by email with Anderson (copying

Grant) and provided a summary of the major topics that were covered.

220.    Shortly thereafter, Anderson notified Plaintiff that her complaint was being

transferred from the Office of the Mayor to the City Law Department.

221.    Upon information and belief, Defendant City transferred her complaint to the City

Law Department because Plaintiff's complaint included complaints against the Head of MOA

(Defendant Kletter) and/or the EEO Officer of MOA (Defendant Kletter).

***Plaintiff Suffers Extreme Distress***

222.    As of this time-period, the discrimination, retaliation, and related hostile work

environment at MOA had caused Plaintiff, in whole or in part, to suffer symptoms, including but

not limited to: (1) difficulty sleeping; (2) hair loss; (3) an elevated heart rate; (4) loss of appetite;

(5) ringing ears; (6) difficulty concentrating; (7) high anxiety; and (8) exacerbation of her asthma

condition.

***Plaintiff Declines a Protected Complaint-Deflecting Mediation by Defendant City, Defendant
Kletter, and/or Defendant Levario***

223.    Ultimately, on or about October 31, 2019, Plaintiff informed Barat that instead of

"mediation" she sought answers to certain questions, and also explicitly conveyed the following

to Barat:

I am more interested in finding out how I can go about getting my job back? I specifically feel that since [Legal Director Mapp-Williams] left this office, my work, my ability to manage, and my ability to partake in conversations and decision-making have been severely curtailed. Some examples (but not a definite list) of this are:

- After [John Doe] appointment, I have not been allowed to partake in any high-level appointments (even though there have been a few and I worked on D-levels and dives for at least two of the high-level appointments being considered/recently announced);
- Until last week, I was stripped of my ability to self-appoint D-Level vets, much less appoint D-Levels to others in our team; I have been given same-day deadlines, and more numerous same-day deadlines, than my colleagues;
- [Jane Doe Two], [Jane Doe One], and I are treated exactly the same by upper management; I do not feel that I am treated as a Deputy Director or as someone with management abilities;
- [Jane Doe Two] has been pulled in to work on more high-level dives and D-level vets than I have and she has a lower rank than I do;
- I have not been pulled into decision-making meetings regarding vets between Michael and the Boards team;
- I have been told that I cannot partake in phone conversations with DOI regarding vets (directly related to my position as Deputy Director of Vetting) and that instead Michael will have 1:1 calls with DOI;
  - When I asked about procedure today, in the event that Michael is not in the office or is not available to call DOI, I was told that Michael will 'figure it out as [he] goes' - essentially communicating to me that, as the next-highest ranking staff member on legal, I am not being allowed to do my work in his absence by covering for him on DOI call;
- I have not been assigned dives or B-levels in some time, I just assigned a B-level to myself yesterday for the first time in weeks;
- When I submit D-levels for review they are edited substantially, editorially (not in substance), and I have not been given feedback as to why my D-levels are being edited extensively nor feedback as to how I can improve;
- I have been curtailed of my ability to supervise others; [Jane Doe Two] has told me that she was instructed not to ask me for updates for the weekly tracker/legal agenda and that Michael should be the only one approached for updates;

- My legal research is being ignored and the law department has been tapped (and supported my legal findings);
- I have not been told about major announcements (most recently about Corporation Counsel) which was only disclosed at the last staff meeting and ·not to me or the legal team independently even though we all worked on vetting candidates for this for months prior; and
- I have been asked why I took an extra 20 minute break, when this has never happened in the past and other colleagues also do so and are not asked about why they took additional time;
- I have never received negative feedback from my supervisors, colleagues, candidates I interacted with or otherwise that explain the above changes in my employment or role in this team. In fact, when [Jane Doe One] and I met the Mayor on 9/26 he thanked us for the "thankless" work we do and for how he appreciates discretion out of our office because there are no leaks out of our office.

I would most appreciate instruction as to how I can go about getting my responsibilities back so I can do my job effectively and support my colleagues.

224.    This email was a protected complaint of retaliation and/or discrimination.

***Plaintiff is Treated for Severe Anxiety***

225.    On or about November 1, 2019, Plaintiff was treated by her physician for severe anxiety related to her job and referred to a psychiatrist for treatment.

226.    Upon arrival at her physician's office, Plaintiff's heartrate had elevated to approximately 118 beats a minute and had required an EKG check of her heart function.

227.    Plaintiff reported to her physician that discrimination and retaliation at work was causing her extreme anxiety and subsequently followed up with a psychiatrist for treatment.

***A Black Woman Resigns from MOA and Reports Defendant Kletter's Racially Discriminatory Conduct***

228.    On or about November 6, 2019, a Black woman resigned from MOA.  She informed Defendant City's Human Resources of her concerns of racial discrimination in the MOA by way of a letter that noted a discrepancy in how Defendant Kletter "treats employees of

color versus other staff in the Office of Appointments."

229.    Among other things, the letter highlighted: (1) Defendant Kletter's tendency to ignore staff of color's inquiries and to respond to others instead of directly responding to the staff member of color; and (2) Defendant Kletter acted coldly with regard to friendly conversations with staff of color (e.g., saying good morning) by ignoring them and/or communicating icy responses.

230.    Moreover, the Black female employee expressed: "This kind of behavior from an EEO officer is disturbing and part of a pattern that I have noticed in other interactions that I have had or personally observed with [Defendant Kletter]."

231.    The letter further states: "These examples are only the most tangible instances that I can provide regarding this behavior.  However, there are countless others that, although difficult to articulate, are part of a clear pattern of macroaggressions and unsupportive leadership for people of color in the Office of Appointments."

232.    Upon information and belief, Defendant City did nothing in response to the concerns raised by this Black woman.

233.    Upon information and belief, since Plaintiff joined MOA, this was the fourth woman of color that had either been pushed out, resigned, and/or left MOA.

***Plaintiff Meets with the City Law Department***

234.    On or about November 12, 2019, Plaintiff met with the City Law Department about her complaint.

235.    During this meeting with City Law Department attorney Shanel Spence ("Spence") and City Law Department Chief Diversity and EEO Officer Sosimo Fabian (Defendant Fabian), Plaintiff extensively detailed the racial discrimination and retaliation that

she was being subjected to in the MOA and provided them with a detailed timeline of the underlying events.

236.     As the meeting came to a close, Spence and/or Defendant Fabian acknowledged that the events she had described were "awful," and, if what she said was substantiated, it was clear that something wrong was going on at MOA.

237.     When the meeting ended, Spence and/or Defendant Fabian told Plaintiff that they would have to notify Defendant Kletter of her complaint.  Plaintiff began breathing heavily and was visibly shaking out of fear of retaliation.

238.     Spence and/or Defendant Fabian told Plaintiff that they would let her know when Defendant Kletter had been informed of her complaint.

***Defendant Kletter Retaliates against Plaintiff by Requiring MOA Employees to Sign a Confidentiality Agreement***

239.     The next day, November 13, 2019, the City Law Department notified Plaintiff that it had informed Defendant Kletter of Plaintiff's EEO complaint against her.

240.     *An hour later*, in an apparent attempt *to retaliate against* and *contractually silence Plaintiff*, Barat immediately sent an email to MOA staff noting "a few personnel changes," including the requirement that everyone sign an unprecedented confidentiality agreement.  The email stated in part:

> As a condition of serving in the Office, you therefore agree that you will not discuss Appointments work outside of the Office and will not disclose *any information obtained through your service* that is not otherwise publicly available.

(emphasis added).

241.     Like Plaintiff, other staff members with the MOA at that time were not familiar with the document and/ or had not been previously asked to sign such an agreement.

242.     Plaintiff did not sign the agreement.

243.     This request to sign a confidentiality agreement concerning "any information obtained through [MOA] service" was in retaliation for, and an attempt to silence Plaintiff's ability to further discuss, her protected EEO complaint and/or opposition.

244.     This was also an attempt to interfere with Plaintiff's exercise of her NYCHRL right to complain about and/or oppose NYCHRL violations.

***Plaintiff Requests FMLA Leave***

245.     As a result of, and following the above, Plaintiff suffered severe anxiety and stress working at MOA.

246.     As described above, as a result of this work environment, and the resulting increasing frequency of her work-related panic attacks, Plaintiff sought the care of a psychiatrist.

247.     Her psychiatrist recommended that Plaintiff take FMLA leave to receive treatment for generalized anxiety and associated panic attacks.

248.     On or about November 18, 2019, Plaintiff submitted the required FMLA paperwork to Diamond Budansingh, DCAS Sr. HR Generalist Administration ("Budansingh"), for an FMLA leave date beginning on December 2, 2019.  In the FMLA paperwork, Plaintiff's health care provider stated the following about the condition for which she sought leave: "Generalized anxiety with panic attacks[.]  Worsening mood and insomnia impacting ability to work."  Budansingh acknowledged receipt.

***Defendants Provide Plaintiff with an Updated Job Description Officially Demoting Her Subsequent to Her Reports of Discrimination/Retaliation***

249.     On or about November 20, 2019, Barat met with Plaintiff in response to her request for an updated job description a month prior.

250.     Barat asserted that she was working on an updated job description.

251.    Barat stated that Defendant Kletter had created new terminology regarding B-Level candidates -- called "Closely Held B-Levels" -- to which Plaintiff would no longer be privy despite her position as Deputy Director of Vetting.

252.    Barat also explicitly downplayed the significance of Plaintiff's role and suggested that it involved "just googling" people.

253.    On or about November 25, 2019, Barat emailed Plaintiff an updated job description, which she confirmed she was working on with Defendant Kletter and Defendant Levario.

254.    On or about November 29, 2019, Barat and Plaintiff met about the updated job description.

255.    During that meeting, Barat warned and, upon information and belief, threatened Plaintiff that she would be receiving more work as a result of her updated job description.

256.    Barat condescendingly told Plaintiff that "made sense" because "if you have the title and are getting paid like a Deputy Director, then you should be doing the work of one."

257.    Plaintiff was taken aback by Barat's undeserved negative and critical comment of Plaintiff's contributions to MOA.  Plaintiff asked Barat about professional development and whether she would have the opportunity to work more closely with experienced attorneys.  Barat dismissed her question by stating there were things that she could not change about the position, that much of the position involved "just googling," and that the position was "not for everyone."

258.    Plaintiff understood Barat's comments and statements during the meeting as a clear signal that Plaintiff's position would not be improving, that her responsibilities were being reduced in substance to "just googling," and that she would not be given opportunities to learn from more experienced attorneys in the future.

259.    Upon information and belief, Barat was trying to force Plaintiff to resign.

260.    In response to this meeting, on or about November 29, 2019, Plaintiff sent Defendant Kletter (*i.e.*, MOA's EEO Officer) and Barat an email complaining about and opposing her demotion and the associated material adverse changes to her position.

261.    Plaintiff's email opposed, and further complained about, her previous disparate treatment and detailed, *inter alia*: (1) that as an attorney of color in the MOA office the treatment she had received had been taxing both emotionally and psychologically; and (2) the many legal and vetting errors Defendant Levario had committed while simultaneously taking work away from her.

262.    She also noted that the new practice of excluding her from "Closely-Held B-Levels" candidate review meant that MOA was effectively excluding her, and in fact, all non-Caucasians on her team, from doing any meaningful work for the office.

263.    Upon information and belief, no investigation or other action was taken in response to her protected complaint.

264.    The same day, Plaintiff prepared and emailed a short memo detailing her outstanding matters to the MOA legal team of Jane Doe One, Jane Doe Two, Defendant Levario, and Defendant Kletter.  Her email further stated that she would be going on FMLA leave as of December 2, 2019.

265.    When she forwarded her memo to Defendant Kletter -- on which she copied Anderson and his supervisor -- she specifically noted that she had not previously disclosed her leave out of fear of retaliation: "[O]ut of fear that by disclosing my need to go on leave, my workload would be further diminished and that the treatment I receive[d] from my supervisors would further deteriorate."

266.     This email was a protected complaint of retaliation and FMLA interference.

***Plaintiff Brings FMLA Paperwork to DCAS and Is Informed MOA Demanded to Know Details about Plaintiff's Medical Basis for Leave***

267.     Plaintiff subsequently began her FMLA leave on or about December 2, 2019, and two days later, on or about December 4, 2019, traveled to DCAS headquarters to deliver additional copies of her FMLA paperwork and meet with Budansingh.

268.     When she arrived, Budansingh asked her if everything was alright.  Budansingh disclosed that she had received a call from the Mayor's Office on or about December 2, 2019 -- the day Plaintiff's leave began -- demanding to know why Plaintiff had gone on leave and demanding copies of her FMLA paperwork.

269.     The MOA individual had further instructed Budansingh that they were entitled to see Plaintiff's paperwork and asserted that Plaintiff had not given adequate notice for her leave.

270.     Although Budansingh told Plaintiff that she had informed the MOA caller that Plaintiff had, in fact, given sufficient notice under the FMLA, she admitted that she had felt incredible pressure to acquiesce to this request from MOA -- but said that she had not done so in order to protect Plaintiff's HIPAA rights.

271.     Upon information and belief, Defendant Kletter was the person from MOA who called and intimidated and/or attempted to intimidate Budansingh about Plaintiff's FMLA leave, and/or otherwise interfered with and/or attempted to interfere with Plaintiff's FMLA leave.

272.     As a result of this meeting and its implications for her job with MOA, and the related new concern about the potential for Plaintiff's protected medical information being retaliatorily accessed and/or released, Plaintiff suffered a severe anxiety attack.

***Plaintiff Extends FMLA Because of Ongoing Medical Condition***

273.     On or about December 23, 2019, Plaintiff was treated by her psychiatrist for her

anxiety and subsequently extended her leave for an additional month to aid in her recovery.  Her psychiatrist wrote a letter, dated December 31, 2019, stating that Plaintiff required an additional month of medical leave for "an ongoing medical condition."

274.    During December 2019 and January 2020, various concerned MOA colleagues contacted Plaintiff to warn her that if she returned to MOA she would be retaliated against by management.

275.    One co-worker also informed her that the treatment of non-Caucasians in the office had further deteriorated since she departed.

276.    On or about January 30, 2020, Plaintiff requested another extension of her FMLA leave.

277.    Upon information and belief, Budansingh, at the direction of Defendant Kletter, immediately contacted her and requested the exact date of her return to work.

278.    On or about January 31, 2020, as a result of the pressure and continuing FMLA interference and the ongoing retaliation from MOA, and her MOA colleagues' warnings of further retaliation if she returned -- and despite having approximately an additional month of FMLA leave left -- Plaintiff resigned from MOA.

279.    The Defendant City constructively discharged Plaintiff and/or interfered with her FMLA rights.

280.    Upon information and belief, in or around Spring 2020, two other employees of color left MOA, including another female attorney of color.

***The Law Department Fails to Fully Investigate and/or Issues an Inaccurate, Formulaic and/or Pre-Determined Unsubstantiated Determination in Response to her Complaint***

281.    On or about February 12, 2020, Plaintiff reached out to the Law Department inquiring about an update on the ongoing EEO investigation as 90 calendar days -- the Law

Department's stated deadline -- had passed since the commencement of the investigation. Plaintiff also provided the Law Department with additional details about Defendant City's and Defendant Kletter's interference with her FMLA rights and her resulting related resignation.

282.    Plaintiff subsequently followed up with the Law Department on numerous occasions inquiring about the status of the investigation.  In response to Plaintiff's inquiries, the Law Department repeatedly made excuses for its ongoing delay since her initial complaint was made with the Law Department on or about November 12, 2019.

283.    On or about February 4, 2021, *one year* after its stated 90-day calendar investigatory deadline, the Law Department provided Plaintiff with a "determination" that her allegations were "unsubstantiated" via a letter from Defendant Fabian, Chief Diversity and EEO Officer.

284.    The letter stated: "Based on our investigation, we have concluded that your complaint should be UNSUBSTANTIATED."

285.    The letter continued:

> The investigation revealed that the vetting arm of the Mayor's Office of Appointments is a fast-paced, stressful, highly demanding work environment that requires long hours and significant toil.  The staff is entrusted with significant responsibility and works at the pleasure of the Administration.  It appears that during the pertinent time period, the office was staffed by a committed and dedicated team that exercised good judgment in performing the job but whose interpersonal interactions, at times, left much to be desired.  We were unable to substantiate with sufficient evidence that these interactions constituted impermissible conduct under the City's EEO policy based on a protected category.

> Regarding your complaint of discrimination and/or retaliation for opposing prohibited conduct we were also unable to find sufficient evidence to substantiate those claims.  As you know, upon the departure of the Director of Vetting you were offered the position of Director, which would have been a promotion.  You declined the position and only upon your declination was the

position offered to someone else.  I mention this because the offer of a promotion, during the relevant time period, is the antithesis of racial animus or retaliation.

In addition, your assertion that the respondent interfered with your FMLA rights was also examined.  You informed our office that there were non-supervising colleagues that suggested you remain on FMLA leave for fear that you would face retaliation for taking leave upon your return.  You also pointed to a number of inquiries made by your supervisor(s) as to when you would be returning to the office.  Upon review of these assertions we noted that there were no demands made of you while on leave to perform work.  Further, we concluded that the suggestion by non-supervisory colleagues that you would be retaliated against, amounted only to speculation, and never materialized as you opted not to return.  As such, we could not conclude that there was interference with your FMLA leave.  Inquiries made to the Human Resources Department as to when an employee will return from leave are permissible where managers are seeking an awareness of what personnel they will have available at a given time.

. . . .

286.    The City Law Department's stated justification of an "unsubstantiated" determination was a bad faith pre-determined investigation that was not intended to determine if there had been an actual violation of federal, state, or NYC discrimination laws and/or to accurately communicate such determination to Plaintiff.

287.    In addition, the City Law Department's stated justification of an "unsubstantiated" determination, was not only wrong, but contained a number of obvious analytical flaws, including but not limited to:

(a)     it incorrectly based its determination in part on a finding of a "fast-paced, stressful" environment;

(b)     it incorrectly based its analysis only on whether "the City's EEO policy based on a protected category" was violated instead of the whether the actual applicable legal "less well" standards of the NYCHRL were violated, where

the "less well" standard was not mentioned anywhere in the City's then

effective 2014 Equal Employment Opportunity Policy: Standards and

Procedures to Be Utilized by City Agencies;

(c)    it failed to base its analysis of retaliation on the "adverse action" retaliation

standard of the NYCHRL (as opposed to the Title VII "materially adverse"

standard) -- which correct standard was not mentioned in the City's then

effective 2014 Equal Employment Opportunity Policy: Standards and

Procedures to Be Utilized by City Agencies;

(d)    it incorrectly reasoned that none of Plaintiff's allegations of retaliation

through January 31, 2020, many of which post-dated her having (barely and

begrudgingly) received *an inquiry* about a promotion in August 24, 2019,

could support her claims of retaliation based solely on her having received this

job inquiry -- particularly when she had explained she declined the position

*out of fear of further retaliation*;

(e)    it ignored the substantial unexplained changes to the terms and conditions of

her position; and

(f)    it ignored Defendant Kletter and Defendant Levario's statements that taking

FMLA leave constituted "insubordination" and additional attempts to interfere

with and restrain her use or attempted use of FMLA rights.

288.    Upon information and belief, the Law Department's investigations of EEO related

complaints have systematically failed to correctly identify actionable discrimination and/or

retaliation under the NYCHRL, not only for Plaintiff, but for dozens, if not hundreds, who make

protected EEO complaints allegedly investigated by the City Law Department during the class period.

289.    Upon information and belief, the vast majority of the Law Department's "investigations" of EEO complaints are pre-determined to result in findings that such complaints are "unsubstantiated," and therefore, the ensuing investigation is designed merely to support that pre-determined conclusion.

290.    The City Law Department has an inherent conflict of interest in serving in the place of an EEO Officer, Commissioner, and/or Agency to reach determinations of EEO complaints.

291.    Because the City Law Department will be tasked with subsequently defending any employment discrimination action, any finding by, it that discrimination was substantiated, would necessarily undercut its legal defense of the City in litigation.

292.    Upon information and belief, this conflict makes a finding that an EEO complaint was "substantiated" difficult, if not impossible -- given the Law Department's loyalties and obligation to defend the City.

293.    In the alternative, to the extent that the City Law Department, because it was a witness to the EEO investigation and was therefore disqualified from representing the City in subsequent litigation of an EEO complaint they evaluated, had a policy or practice of hiring outside counsel to defend those actions, this policy also incentivized and caused findings of "unsubstantiated" EEO complaints.  In such cases, the Law Department had a heavy incentive to make determinations of "unsubstantiated" EEO complaints because of the additional expense the Law Department and/or the City would incur from hiring outside counsel to defend the subsequent litigations of these EEO complaints it had found were unsubstantiated.

294.    Upon information and belief, when not resolved within a Commission or Agency by the Commissioner and/or Agency Head, the Law Department was frequently tasked with investigating agency complaints against Commissioners, Agency Heads, and/or EEO Officers.

295.    Upon information and belief, the Law Department frequently investigated allegations against Commissioners, Agency Heads, and/or EEO Officers.

296.    Upon information and belief, the Law Department was and is also tasked with defending the City in *all* litigation, including employment litigation against the City.

297.    The Defendant City's policy of referring many EEO investigation complaints concerning Commissioners, Agency Heads, and/or EEO Officers to the Law Department -- the very agency that will subsequently defend the City in litigation if the EEO complaints are pursued as lawsuits -- was a pattern, policy, and/or practice that typically (if not by definition) aids and abets the City's and its most senior leadership's discriminatory and/or retaliatory conduct, by frequently providing pretextual cover for violations of anti-discrimination and anti-retaliation laws.

298.    Upon information and belief, instead of providing *bona fide* good faith EEO investigations -- the purpose of which was to determine if there had been illegal violations of federal, state, and/or city retaliation discrimination statutes -- the City Law Department frequently issued bad faith and/or pre-determined "unsubstantiated" findings in order to deter, coerce, intimidate, threaten, and/or interfere with, and/or attempt to deter, coerce, intimidate, threaten, and/or interfere with EEO complainants, with complaints against Commissioners, Agency Heads, and/or EEO Officers, from pursuing their allegations further, including by filing a lawsuit in court.

299.    Upon information and belief, instead of providing *bona fide* good faith EEO investigations of complaints against Commissioners, Agency Heads, and/or EEO Officers -- the purpose of which was to determine if there had been illegal violations of federal, state, and/or city retaliation discrimination statutes -- the City Law Department frequently attempted to utilize its bad faith EEO investigation to delay EEO complainants filing charges with the EEOC and/or the NYC Human Rights Commission within their respective 300-day and one-year deadlines.

300.    For example, the Law Department's year-long investigation of Plaintiff's EEO complaint took just long enough -- just three to five months too long -- for Plaintiff to no longer be able to file a timely EEOC charge and/or the NYC Commission on Human Rights complaint concerning the content of her EEO complaint.

301.    Upon information and belief, instead of providing *bona fide* good faith EEO investigations concerning Commissioners, Agency Heads, and/or EEO Officers -- the purpose of which was to determine if there had been illegal violations of federal, state, and/or city retaliation discrimination statutes -- the City Law Department attempted to suggest or imply that its findings of an EEO complaint being "unsubstantiated" were unbiased and/or had meaningful legal meaning concerning the actual legal validity of the allegations in the EEO complaint.

***DCAS Intentionally Failed to Incorporate Municipal Law Standards into Its EEO Policies and Procedures***

302.    Upon information and belief, DCAS's EEO policy, in effect from 2014 to 2021, simply failed to mention, incorporate, describe, account for, or instruct its Commissioners, Agency Heads, EEO officers, and/or NYC employees generally concerning the "less well" discrimination and "adverse action" retaliation prohibitions and/or legal standards of the NYCHRL.

303.    Upon information and belief, DCAS failed to incorporate guidance concerning the prohibitions of the NYCHRL despite receiving guidance from the City's EEPC (Equal Employment Practices Commission) concerning the applicability of the NYCHRL.

304.    Upon information and belief, the EEPC has systematically failed in its obligation under the NYC Charter to incorporate and implement City law into the City's EEO policies and procedures.

### The NYC EEPC Failed to Properly Advise, Audit, and/or Ensure Compliance with EEO Concerning Policies and Procedures Required to Comply with NYCHRL Standards

305.    Upon information and belief, the EEPC, during the period of at least 2014-2020, either through policy guidance or by requiring that DCAS update its policies as a result of a failed audit, failed to incorporate the prohibitions of the NYCHRL.

306.    During approximately 2017, DCAS partially failed an audit by the EEPC of its internal implementation of the very EEO policies and practices that it promulgated for Defendant City, and was subjected to required corrective actions, evaluation and monitoring of its employment practices and procedures.

307.    For example, upon information and belief, the audit determined that DCAS had failed to properly train even its own EEO professionals, and was therefore required by the EEPC to, *inter alia*, "[e]nsure that EEO professionals are trained in EEO laws and procedures and know how to carry out their responsibilities under the EEO Policy by promptly attending training for EEO professionals by DCAS or another appropriate agency/school."

308.    During approximately 2018, upon information and belief, the Office of the Mayor, of which MOA is a part, partially failed an audit by the EEPC, and was subjected to required corrective actions, evaluation and monitoring of its employment practices and procedures.

309.    For example, upon information and belief, the audit determined that the Office of the Mayor partially failed an audit of its complaint and investigation procedures, including failures to "include a completed complaint intake form or a written complaint that captured facts that identified the respondent with reasonable specificity and provided the essence of the circumstances which gave rise to the complaint."

310.    During approximately 2018, upon information and belief, the City Law Department partially failed an audit by the EEPC with respect to failing to "maintain documentation of decisions from the . . . meetings [of the EEO Professional and Agency Head] that impacted the administration and operation of the EEO program," and was ordered to "maintain documentation of decisions from the aforementioned meetings that impacted the administration and operation of the EEO program."

311.    Upon information and belief, DCAS has systematically failed to establish and enforce uniform procedures and standards to be utilized by City agencies in establishing measures, programs and plans to ensure equal employment opportunities for minority group members and women who are employed by, or who seek employment with, City agencies.

312.    Upon information and belief, during at least the period 2014-2020, the EEPC has systematically failed to advise DCAS of the prohibitions imposed by the NYCHRL, concerning the "less well" discrimination and "adverse action" retaliation prohibitions and/or legal standards of the NYCHRL.

313.    Upon information and belief, during at least the period 2014-2020, EEPC has systematically failed to incorporate the NYCHRL's "less well" discrimination standard and/or "adverse action" retaliation standard, into its evaluation, monitoring, and/or compliance concerning Defendant City's agencies and commissions.

314.    For example, upon information and belief, even the EEPC annual reports for the period 2014-2020, failed to correctly describe the legal "less well" discrimination and "adverse action" retaliation prohibitions and/or legal standards of the NYCHRL.

315.    Upon information and belief, by failing to incorporate the legal standards required by the NYCHRL under municipal law, EEPC has systematically failed to discharge its obligation to effectively review the standards, procedures, and programs established by the Department of Citywide Administrative Services to ensure a fair and effective affirmative employment plan of equal employment opportunity for city agencies.

***Defendant City Promotes Defendant Kletter and Defendant Levario and Disregards Multiple Reports of Discrimination and Retaliation against Them***

316.    Notably, on or about March 13, 2021, approximately one month after the City issued an "unsubstantiated" determination with regard to Plaintiff's EEO complaint, Defendant Kletter was appointed by Mayor Bill de Blasio as the Administrator of the Office of Administrative Trials and Hearings ("OATH") at a reported salary of $227,787 a year.[3]

317.    The announcement stated:

> As Commissioner, Kletter will work to ensure that even more New Yorkers have *equal access to justice* and that the City remains a clean and safe place to live for all. Kletter currently serves as the Director of the Mayor's Office of Appointments, and brings over 15 years of legal and government experience to the position.
>
> "Joni is a one-of-a-kind public servant who has helped build a team of leaders who are dedicated to our key mission: *making this city fairer for all.* Now, I am thrilled to welcome her as Commissioner and Chief Administrative Law Judge of OATH, where she will continue her good work *by ensuring our administrative courts are*

---

[3]    Available at https://www1.nyc.gov/office-of-the-mayor/news/139-20/mayor-de-blasio-appoints-joni-kletter-commissioner-chief-administrative-law-judge-the. (last visited Mar. 29, 2022); https://www.thecity.nyc/work/2021/4/1/22363261/de-blasio-supporters-get-city-jobs-at-oath (last visited Mar. 25, 2022).

*just and fair, and all New Yorkers are heard*," said Mayor Bill de Blasio.[4]

(emphasis added).[5]

318.    Similarly, and in direct contrast to the treatment of Plaintiff at MOA, Defendant Levario (a Caucasian and/or light-skinned male), only a 2016 law graduate admitted to the bar as recently as 2018, was -- somehow catapulted from a position as an unbarred legal intern to: (1) being paid an hourly wage in 2016; (2) Special Counsel; (3) Deputy Director of Research in MOA; and (4) Senior Counsel and Director of Vetting of MOA.

## CLASS ACTION ALLEGATIONS

319.    Plaintiff brings this action as a class action pursuant to the NYCHRL, against Defendant City, with respect to claims for: (1) coercion, intimidation, and/or interference with NYCHRL rights; (2) attempted coercion, intimidation, and/or interference with NYCHRL rights; (3) aiding and/or abetting NYCHRL violations; (4) attempted aiding and/or abetting of NYCHRL violations; and (5) retaliation.  Plaintiff seeks declaratory and injunctive relief pursuant to Fed. R. Civ P. 23(a), (b)(2), and (c)(4), for these claims, on behalf of a class of all City employees who made a protected written or oral EEO complaint concerning a Commissioner, Agency Head, and/or EEO Officer, at any time from July 20, 2019 through the resolution of this litigation, which EEO complaint was subsequently referred to the Law Department (the "NYCHRL Class").

320.    Plaintiff additionally brings this action as a class action on behalf of the

---

[4]    https://www1.nyc.gov/office-of-the-mayor/news/139-20/mayor-de-blasio-appoints-joni-kletter-commissioner-chief-administrative-law-judge-the (last visited July 20, 2022).

[5]    Earlier this year, Defendant Kletter was replaced by Asim Rehman as Commissioner of OATH and Chief Administrative Law Judge.

NYCHRL Class with respect to NYCHRL disparate impact claims, based on a disparate impact on the NYCHRL Class as a result of their having made a protected EEO complaint that was referred to the Law Department.

321.    Plaintiff additionally brings this action as a class action, pursuant to 42 U.S.C. § 1981, on behalf of a class of all City employees who made a written or oral EEO complaint concerning race, ethnicity, and/or ancestry discrimination and/or related retaliation concerning a Commissioner, Agency Head, and/or EEO Officer, at any time from July 20, 2018 through the resolution of this litigation, which EEO complaint was subsequently referred to the Law Department (the "1981 Class").

322.    Plaintiff additionally brings this action as a class action, pursuant to 42 U.S.C. § 1983, on behalf of a class of all City employees who made a protected written or oral EEO complaint concerning a Commissioner, Agency Head, and/or EEO Officer, on the basis of sex discrimination, race and/or ethnicity discrimination, and/or retaliation for complaints of the same, at any time from May 31, 2019 through the resolution of this litigation (the "1983 Class").

323.    Accordingly, Plaintiff brings the Ninth, Tenth, and Eleventh Causes of Action against Defendant City and Defendant Fabian, and the Twelfth Cause of Action against Defendant City, as a class action pursuant to Fed. R. Civ. P. 23(a), (b)(2), and (c)(4), on behalf of the NYCHRL Class, the Fourth Cause of action against Defendant City, as a class action pursuant to Fed. R. Civ. P. 23(a), (b)(2), and (c)(4), on behalf of the 1981 Class, and the Fifth Cause of Action against the Defendant City as a class action pursuant to Fed. R. Civ. P. 23(a), (b)(2), and (c)(4) on behalf of the 1983 Class.

324.    Plaintiff is a member of the Class(es) she seeks to represent.

325.    The members of the Class(es) identified herein are so numerous that joinder of all

members is impracticable.

326.    Although Plaintiff does not know the precise number of the members of the

Class(es) their number is greater than can be feasibly addressed through joinder.

327.    There are questions of law and fact common to the NYCHRL Class concerning

their NYCHRL claims, including, but not limited to whether:

(1)    Defendant City, through the Law Department, and/or Defendant Fabian, engaged

in a policy and/or practice of: (a) issuing pre-determined and/or bad faith

findings that EEO complaints are "unsubstantiated"; (b) failing to properly, fully,

in good faith, and/or fairly investigate EEO complaints concerning whether there

was a violation of the NYCHRL and/or accurately advising complainants of the

same; (c) failing to disclose that it has an inherent conflict of interest in favor of

finding that EEO complaints are "unsubstantiated" because of its role as attorney

to the City and future litigation counsel; (d) failing to appropriately disclose its

conflict of interest and/or interest in reaching a finding that an EEO complaint is

"unsubstantiated" because of its role as attorney to the City and future litigation

counsel; (e) utilizing EEO "unsubstantiated" findings to deter, coerce, intimidate,

threaten, and/or interfere with, and/or attempt to deter, coerce, intimidate,

threaten, and/or interfere with EEO complainants pursuing their allegations

further, and/or to delay filing an administrative charge or complaint within the

required limitations period(s);

(2)    Defendant City, through the Law Department, and/or Defendant Fabian, had a

policy or practice of declining to identify NYCHRL violations in conducting

EEO complaint investigations, either because of their own intentional internal

policies, or because of DCAS's failure to issue EEO policies incorporating the NYCHRL "less well" and "adverse action" legal standards;

(3)     the Law Department and/or Defendant Fabian had a policy or practice of issuing *pro forma,* bad faith, and/or pre-determined "unsubstantiated" determinations in response to employee complaints of discrimination, discriminatory harassment, and/or retaliation;

(4)     as a result of engaging in some or all of the foregoing policies and/or practices, Defendant City, the Law Department, and/or Defendant Fabian, had a policy or practice of systematically aiding, abetting, and/or attempting to aid, abet the City's Commissioners, Agency Heads, and/or EEO Officers concerning EEO allegations against them by the Class;

(5)     as a result of engaging in some or all of the foregoing policies and/or practices, Defendant City, through the Law Department, and/or Defendant Fabian, had a policy or practice of systematically inciting and/or encouraging the City's Commissioners, Agency Heads, and/or EEO Officers to engage in NYCHRL violations against the Class;

(6)     as a result of engaging in some or all of the foregoing policies and/or practices, Defendant City and/or Defendant Fabian, through its Law Department, had a policy or practice of systematically coercing, intimidating, and/or interfering with and/or attempting to coerce, intimidate, and/or interfere with the Class's exercise and/or enjoyment of their NYCHRL rights, including whether such policy and/or practice had a reasonable tendency to coerce or intimidate employees, irrespective of whether they were actually coerced and/or

intimidated;

(7)     as a result of engaging in some or all of the foregoing policies and/or practices, and/or because or in part because, the Class had engaged in protected activity by filing an EEO complaint, Defendant City and/or Defendant Fabian, through its Law Department, had a policy or practice of retaliating against the Class by providing them pre-determined and/or bad faith findings that their EEO charge was "unsubstantiated" and/or by otherwise intentionally failing to engage in a good faith, adequate, and/or accurate EEO investigation and/or intentionally failing to indicate the accurate findings of such investigation to the Class, and whether such actions were adverse actions under the NYCHRL;

(8)     whether DCAS and/or EEPC aided and abetted or and/or attempted to aid and abet NYCHRL violations and/or interfered with and/or attempted to interfere with the exercise of NYCHRL rights through their failure to carry out their required duties;

(9)     whether a class-wide declaratory relief is warranted, and if so, the appropriate scope of relief;

(10)    whether a class-wide injunctive relief is warranted, and if so, the appropriate scope of relief;

(12)    whether Commissioners, Agency Heads, and/or EEO Officers are each: (1) an "employee" of an "employer"; (2) or "agent" of an "employer" with respect to Defendant City's and/or Fabian's policies aiding and abetting of their discrimination against the Class;

(13)    whether Commissioners, Agency Heads, and/or EEO Officers are "person[s]"

with respect to the Defendant City's and/or Defendant Fabian's aiding and abetting of their retaliation and/or interference with the exercise or enjoyment of NYCHRL rights against the Class;

(14)    whether Defendant City and/or Defendant Fabian were a "person" with respect to their aiding and abetting of NYCHRL violations by Commissioners, Agency Heads, and/or EEO Officers against the Class;

(15)    whether Defendant City and/or Defendant Fabian were a "person" with respect to their coercing, intimidating, and/or interfering with and/or attempting to coerce, intimidate, and/or interfere with the exercise or enjoyment of NYCHRL of the Class;

(16)    whether Defendant City's referral of EEO complaints to the City Law Department had a disparate impact on Plaintiff and/or city employees who engaged in the protected activity of making an EEO complaint, through disproportionate and/or statistically significant increase in discipline, resignations, and/or terminations following the referral of EEO complaints to the Law Department;

(17)    whether Defendant City's referral of EEO complaints to the City Law Department had a legitimate significant relationship to a significant business objective of Defendant City;

(18)    whether the City could have used less discriminatory measures instead of the policy of referral of EEO complaints to the City Law Department;

(19)    Defendant City's policies and/or practices concerning the provision of guidance on what constituted a violation of the NYCHRL to the Law Department; and

(20)     whether the Defendant City's policies and/or practices concerning the provision
         of such guidance to the Law Department concerning NYCHRL violations
         resulted in a disparate impact on the NYCHRL Class concerning discipline,
         resignations, and/or terminations

328.     There are additional questions of law and fact common to the 1983 Class
concerning the claims under 42 U.S.C. § 1981, including whether Defendant City and/or
Defendant had a policy or practice of retaliating against the Class by providing them pre-
determined and/or bad faith findings that their EEO charge was "unsubstantiated" and/or by
otherwise intentionally failing to engage in a good faith, adequate, and/or accurate EEO
investigation and/or intentionally failing to indicate the accurate findings of such investigation to
the Class, and whether such actions were materially adverse actions under § 1981.

329.     There are additional questions of law and fact common to the 1983 Class
concerning the claims under 42 U.S.C. § 1983, including, but not limited to whether Defendant
City had accepted custom policy and/or practice and/or procedure of: (1) discouraging EEO
complaints concerning race and/or sex discrimination; (2) not treating oral EEO complaints of
race and sex discrimination as EEO complaints; (3) discouraging complaints of any kind
concerning Commissioners, Agency Heads, and/or EEO Officers; (4) ignoring and/or taking no
action in response to EEO complaints of race and/or sex discrimination; (5) attempting to
discourage and/or attempting to avoid employees filing of formal written EEO complaints of
race and/or sex discrimination including following submission of an initial oral complaint; (6)
conducting bad faith investigations of EEO complaints of race and/or sex discrimination for
which the outcome that they were "unsubstantiated" was pre-determined; (7) referral of EEO
complaints of race and/or sex discrimination to the City Law Department to conduct bad faith

investigations of EEO complaints for which the outcome that they were unsubstantiated was pre-

determined; and/or (8) permitting and/or encouraging retaliation by the Commissioner, Agency

Head, EEO Officers against whom the Class filed EEO complaints of race discrimination, sex

discrimination by failing to address, acquiescing to, constructively acquiescing to, encouraging,

and/or permitting race discrimination, sex discrimination, and/or related retaliation, through an

accepted custom, practice, policy, and/or procedure of ignoring these EEO complaints and/or

retaliating in response to these EEO complaints.

330.     Similarly, there are additional questions of law and fact common to the 1983

Class concerning the claims under 42 U.S.C. § 1983, including, but not limited to whether

Defendant City had accepted custom policy and/or practice and/or procedure of failing

to sufficiently train Commissioners, Agency Heads, and EEO Officers and/or supervise its

Commissioners, Agency Heads, and EEO Officers in order to: (1) appropriately and timely

identify oral complaints of discrimination and/or retaliation as protected EEO complaints

regardless of whether they are subsequently submitted as written complaints; and (2)

appropriately identify potential discrimination and retaliation violations; and (3) refrain from

retaliating and/or instructing others to refrain from retaliating against employees who make EEO

complaints concerning Commissioners, Agency Heads, and/or EEO Officers.

331.     Plaintiff's claims are typical of the claims of the Class.

332.     Plaintiff will fairly and adequately represent the interests of the members of the

Class.

333.     Plaintiff has retained counsel competent and experienced in employment class

actions.

334.     Class certification of the Class(es) is appropriate pursuant to Fed. R. Civ. P.

23(b)(2) because Defendant City and /or Defendant Fabian have acted and/or refused to act on grounds generally applicable to the Class, making declaratory and injunctive relief appropriate with respect to Plaintiff and the Class(es) as a whole.  The class members are entitled to declaratory and injunctive relief concerning Defendant City's and/or Defendant Fabian's discriminatory and/or retaliatory policies, practices, customs, and/or procedures.

335.    Class certification is also appropriate pursuant to Fed. R. Civ. P. 23(c)(4) because the resolution of additional common issues, would reduce the range of issues in dispute and promote judicial economy.

336.    Excluded from the Class are: (1) Defendants; (2) Defendants' legal representatives, officers, directors, assigns, and successors, or any individual who has, or at any time during the class period has had, a controlling interest in Defendants; (3) the Judge(s) to whom this case is assigned and any member of the Judge's immediate family; and (4) all persons who will submit timely and otherwise proper requests for exclusion from the Class.

337.    Pursuant to a written agreement between the parties, Plaintiff and Defendant City agreed to toll Plaintiff's claims alleged herein, from May 23, 2022 to and through July 15, 2022, with respect to Plaintiff's claims against Defendant City.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION
**FMLA**
**Interference and Restraint in Violation of 29 U.S.C. § 2615**
**(Brought on Behalf of Plaintiff against Defendant City and Defendant Kletter)**

338.    Plaintiff hereby realleges and incorporates by reference all allegations in the preceding paragraphs.

339.    Defendant City and Defendant Kletter willfully interfered with and/or restrained Plaintiff's exercise of and/or attempt to exercise her FMLA rights.

340.    At all times during Plaintiff's employment with Defendant City, Defendant City and Defendant Kletter were employers within the meaning of the FMLA.

341.    At all times during Plaintiff's employment with Defendant City, Defendant Kletter exercised operational control over MOA, Plaintiff, and other employees of MOA.

342.    At all times during Plaintiff's employment with Defendant City, Defendant City and Defendant Kletter engaged in commerce and/or an industry and/or activity affecting commerce.

343.    At all times during Plaintiff's employment with the Defendant City, Plaintiff was an employee within the meaning of the FMLA.

344.    Plaintiff was an FMLA "eligible employee" pursuant to 29 U.S.C. § 2611(2) at all times relevant to the Complaint.  At all times relevant to the Complaint, Plaintiff had been employed for at least twelve months and worked at least 1,250 hours during the previous twelve-month period, and the total number of employees of the MOA and/or the City was fifty or more employees within seventy-five miles of Plaintiff's worksite.

345.    Plaintiff provided Defendant City and/or Defendant Kletter with adequate notice of her intent to take FMLA leave.

346.    During Plaintiff's leave, Plaintiff was receiving continuing treatment for a serious health condition within the meaning of 29 C.F.R. § 825.115(c) and/or 29 C.F.R. § 825.115(e)(2) for generalized anxiety and associated panic attacks, which treatment continued through her constructive discharge on or about January 31, 2020.

347.    Immediately prior to and during this leave, Plaintiff was entitled to FMLA leave pursuant to 29 C.F.R. § 825.112(a)(4) and 29 C.F.R. § 825.123, because she had a serious health condition of generalized anxiety and associated panic attacks, and her health provider determined

that she needed to be absent from work to receive medical treatment for her serious health condition.

348.    Prior to Plaintiff taking FMLA leave, Defendants Kletter and Levario had expressed explicit disapproval of and/or discouraged the use of, FMLA leave, including stating to Plaintiff that they considered the use of FMLA leave to be "insubordination."

349.    Subsequent to Legal Director Mapp-Williams's return from FMLA leave, Defendant City and Defendant Kletter subjected Legal Director Mapp-Williams to materially adverse action, as she was stripped of her authority, pushed out of her position as Legal Director of MOA, and forced to transfer to another department within the Defendant City.

350.    Upon information and belief, Defendant Kletter willfully interfered with and/or restrained Plaintiff's exercise or attempt to exercise her FMLA leave rights, by claiming to DCAS that Plaintiff had not provided sufficient notice prior to taking leave.

351.    Defendant Kletter interfered with Plaintiff's use of FMLA leave by discouraging her from taking leave with her anti-FMLA leave statements that taking FMLA leave was "insubordination."

352.    Upon information and belief, Defendant Kletter further willfully interfered with Plaintiff's FMLA rights by seeking to personally obtain Plaintiff's private medical information and by seeking her FMLA paperwork from DCAS.

353.    Upon information and belief, Defendant Kletter willfully interfered with and/or restrained Plaintiff from taking leave, including by claiming that Plaintiff had not provided sufficient notice and/or seeking to personally obtain Plaintiff's FMLA medical records from DCAS to contest that she qualified for FMLA leave.

354.    While on FMLA leave, in or around December 2019 and January 2020, Plaintiff

was informed by colleagues that they were concerned MOA management planned to retaliate against her if she returned from FMLA leave.

355.    On or about January 30, 2020, Plaintiff requested a further extension of her FMLA leave. Defendant City and Defendant Kletter, via Budansingh, demanded the exact date of her return -- further interfering with, restraining, and/or denying the complete exercise of Plaintiff's FMLA leave rights by discouraging further use of leave and/or suggesting to Plaintiff that extending her leave was impermissible or discouraged, which communication did not include an explanation of her remaining available FMLA leave she could use.

356.    On or about January 31, 2020, the next day, Plaintiff resigned.

357.    Plaintiff had approximately one additional month of FMLA leave.

358.    Defendant City and Defendant Kletter willfully interfered with, restrained, and/or denied Plaintiff's exercise and/or attempted exercise of her FMLA leave rights, by preventing Plaintiff from fully exercising, utilizing, protecting, and/or most effectively structuring her FMLA leave, inclusive of Plaintiff using some or all of her available protected FMLA leave entitlement, either concurrently or intermittently, and/or remaining on FMLA for her entire twelve-week period instead of resigning.

359.    As an eligible employee, Plaintiff was entitled to take up to a total of twelve weeks of protected FMLA leave during each twelve-month period pursuant to 29 C.F.R. § 825.200.

360.    Plaintiff relied on Defendant City and Defendant Kettler for the opportunity to render her services in her position with Defendant City.

361.    Plaintiff had no opportunity for profit or loss or investment in the business while working for Defendant City.

362.    Plaintiff suffered damages as a result of Defendant City's and Defendant Kletter's FMLA violations.

363.    Upon information and belief, Defendant City's and Defendant Kletter's FMLA violations were willful.

364.    Upon information and belief, Defendant City's and Defendant Kletter's FMLA violations were not in good faith.

365.    Upon information and belief, Defendant City and Defendant Kletter did not have reasonable grounds for believing that their acts or omissions complied with the FMLA.

366.    As a result of Defendant City's and Defendant Kletter's willfull FMLA violations, Plaintiff is entitled to recover back pay, liquidated damages, actual damages, declaratory relief, injunctive relief, attorney's fees, and costs.

### SECOND CAUSE OF ACTION
**FMLA**
**Retaliation in Violation of 29 U.S.C. § 2615**
**(Brought on Behalf of Plaintiff Against Defendant City and Defendant Kletter)**

367.    Plaintiff hereby realleges and incorporates by reference all allegations in the preceding paragraphs.

368.    Defendant City and Defendant Kletter willfully retaliated against, discriminated against, interfered with, and/or restrained Plaintiff's exercise of and/or attempt to exercise her FMLA rights because of her request for FMLA leave and/or opposition to Defendant's FMLA interference and/or restraint.

369.    At all times during Plaintiff's employment with Defendant City, Defendant City and Defendant Kletter were employers within the meaning of the FMLA.

370.    At all times during Plaintiff's employment with Defendant City, Defendant Kletter exercised operational control over MOA, Plaintiff, and other employees of MOA.

371.    At all times during Plaintiff's employment with Defendant City, Defendant City and Defendant Kletter engaged in commerce and/or an industry and/or activity affecting commerce.

372.    At all times during Plaintiff's employment with Defendant City, Plaintiff was an employee within the meaning of the FMLA.

373.    Plaintiff was an FMLA "eligible employee" pursuant to 29 U.S.C. § 2611(2) at all times relevant to the Complaint.  At all times relevant to the Complaint, Plaintiff had been employed for at least twelve months and worked at least 1,250 hours during the previous twelve-month period, and the total number of employees of the MOA and/or the City was fifty or more employees within seventy-five miles of Plaintiff's worksite.

374.    Plaintiff provided Defendant City and/or Defendant Kletter with adequate notice of her intent to take FMLA leave.

375.    During Plaintiff's leave, Plaintiff was receiving continuing treatment for a serious health condition within the meaning of 29 C.F.R. § 825.115(c) and/or 29 C.F.R. § 825.115(e)(2) for generalized anxiety and associated panic attacks, which treatment continued through her constructive discharge on or about January 31, 2020.

376.    Immediately prior to and during this leave, Plaintiff was entitled to FMLA leave pursuant to 29 C.F.R. § 825.112(a)(4) and 29 C.F.R. § 825.123, because she had a serious health condition of generalized anxiety and associated panic attacks, and her health provider determined that she needed to be absent from work to receive medical treatment for her serious health condition.

377.    Prior to Plaintiff taking FMLA, Defendant Kletter had expressed explicit disapproval of, and discouraged the use of, FMLA leave, including stating to Plaintiff that she

considered the use of FMLA leave to be "insubordination."

378.    Subsequent to Legal Director Mapp-Williams's return from FMLA leave, Defendant City and Defendant Kletter subjected Legal Director Mapp-Williams to materially adverse action, as she was stripped of her authority, pushed out of her position as Legal Director of MOA, and forced to transfer to another department within Defendant City.

379.    Defendant Kletter willfully discriminated and/or retaliated against Plaintiff for requesting leave and/or opposing Kletter's prior FMLA violations, by attempting to block and/or interfere with Plaintiff's use of FMLA leave by claiming Plaintiff had not provided sufficient notice prior to taking leave.

380.    Defendant City and Kletter discriminated against and/or retaliated against Plaintiff because of, or in part because of, her requests for and/or attempts to request FMLA leave, including but not limited to by: (1) Defendant City conducting a bad faith, pre-determined, and/or ineffective investigation of her EEO complaint; and (2) Kletter, upon information and belief,  attempting to stop Plaintiff from taking leave, including by claiming that Plaintiff had not provided sufficient notice and/or seeking to personally obtain Plaintiff's FMLA medical records from DCAS to contest that she qualified for FMLA leave.

381.    Defendant City and/or Defendant Kletter used Plaintiff's requests for and/or attempts to request FMLA leave as a motivating factor in: (1) Defendant City conducting a bad faith, pre-determined, and/or ineffective investigation of her EEO complaint; and (2) upon information and belief, Defendant Kletter attempting to stop Plaintiff from taking leave, including by Defendant Kletter attempting to claim that Plaintiff had not provided sufficient notice and/or seeking to personally obtain Plaintiff's FMLA medical records from DCAS to contest that she qualified for FMLA leave, each of which were materially adverse actions that

could well dissuade a reasonable worker from exercising or attempting to exercise their FMLA rights.

382.    While on FMLA leave, in or around December 2019 and January 2020, Plaintiff was informed by colleagues that were concerned MOA management planned to retaliate against her if she returned from FMLA leave.

383.    On or about January 30, 2020, Plaintiff requested a further extension of her FMLA leave, Defendant City and Defendant Kletter, via Budansingh, demanded the exact date of her return -- further retaliating and/or discriminating against her, by suggesting to Plaintiff that extending her leave was impermissible or discouraged -- which communication did not include an explanation of her remaining available FMLA leave she could use.

384.    On or about January 31, 2020, the next day, Plaintiff resigned.

385.    Plaintiff had approximately one additional month of FMLA leave remaining.

386.    As an eligible employee, Plaintiff was entitled to take up to a total of twelve weeks of protected FMLA leave during each twelve-month period pursuant to 29 C.F.R. § 825.200.

387.    Plaintiff relied on Defendant City and Defendant Kettler for the opportunity to render her services in her position with Defendant City.

388.    Plaintiff had no opportunity for profit or loss or investment in the business while working for Defendant City.

389.    Plaintiff suffered damages as a result of Defendant City's and Defendant Kletter's FMLA violations.

390.    Upon information and belief, Defendant City's and Defendant Kletter's FMLA violations were willful.

391.    Upon information and belief, Defendant City's and Defendant Kletter's FMLA violations were not in good faith.

392.    Upon information and belief, Defendant City and Defendant Kletter did not have reasonable grounds for believing that their acts or omissions complied with the FMLA.

393.    As a result of Defendant City's and Defendant Kletter's FMLA violations, Plaintiff is entitled to recover actual damages, liquidated damages, declaratory relief, injunctive relief, attorney's fees, and costs.

**THIRD CAUSE OF ACTION**
**Disparate Treatment**
**Race and/or Ethnicity Discrimination in Violation of the Civil Rights Act 42 U.S.C. § 1981**
**(Brought on Behalf of Plaintiff Against Defendant Kletter)**

394.    Plaintiff hereby realleges and incorporates by reference all allegations in the preceding paragraphs.

395.    This claim is brought by Plaintiff on behalf of herself.

396.    Defendant Kletter intentionally discriminated against Plaintiff because of her Hispanic race, ethnicity, and/or ancestry.

397.    Defendant Kletter was operating under color of state law when discriminating against Plaintiff.

398.    Defendant Kletter engaged in disparate treatment of Plaintiff because of her Hispanic race, ethnicity, and/or ancestry, including, but not limited to, by: (1) selecting Defendant Levario for promotion over Plaintiff because of her race, ethnicity, and/or ancestry, despite Plaintiff's superior or equal qualifications for the position; and (2) demoting Plaintiff and taking away her job duties without justification and despite her superior or equal qualifications for the position as compared to Levario.

399.    Plaintiff was subjected to disparate treatment because of her Hispanic race,

ethnicity, and/or ancestry.

400.    Defendant Kletter's discrimination impaired a contractual employment relationship with Plaintiff.

401.    Defendant Kletter was personally involved in the race, ethnicity, and/or ancestry discrimination against Plaintiff, including but not limited to, by selecting Levario for promotion over Plaintiff.

402.    Defendant Kletter's conduct violated Section 1981.

403.    Defendant Kletter's illegal discriminatory conduct caused Plaintiff's injuries.

404.    Plaintiff was a citizen or person within the jurisdiction of the United States within the meaning of 42 U.S.C. § 1981.

405.    But for Plaintiff's Hispanic race, ethnicity, and/or ancestry, Plaintiff's injuries would not have occurred.

406.    At all times relevant to the Complaint, Defendant Kletter was a covered person within the meaning of 42 U.S.C. § 1981.

407.    Upon information and belief, Defendant Kletter engaged in intentional discrimination against Plaintiff with malice or a reckless indifference to the federally protected rights of Plaintiff.

408.    As a direct and proximate result of Defendant Kletter's unlawful employment practices, Plaintiff has suffered and is entitled to damages, but not limited, to back pay, front pay, emotional distress damages, attorney's fees, and costs, as well as punitive damages against Defendant Kletter.

**FOURTH CAUSE OF ACTION**
**Retaliation in Violation of the Civil Rights Act 42 U.S.C. § 1981**

**(Brought on Behalf of Plaintiff against All Defendants)**
**(Brought on Behalf of the Class Against Defendant City and Defendant Fabian)**

409.     Plaintiff hereby realleges and incorporates by reference all allegations in the preceding paragraphs.

410.     Defendants retaliated against Plaintiff because of her protected complaints of race, ethnicity, and/or ancestry discrimination and related retaliation.

411.     Defendants engaged in retaliation against Plaintiff because of her complaints of race, ethnicity, and/or ancestry discrimination and/or related retaliation, including, but not limited to by, attempting to force her and other employees to enter into confidentiality agreements covering the subject matter of her complaints, pretextually criticizing her ability to do work because it was purportedly too difficult for her and/or pretextually telling her she needed to step up her work, declining to simply promote her to take Legal Director Mapp-Williams' position, ignoring Plaintiff in meetings, excluding her from assignments relevant to her title, no longer inviting her on jogs, demoting her, and removing her core job responsibilities, each of which were materially adverse actions that could well dissuade a reasonable worker from engaging in protected activity.

412.     Defendants were operating under color of state law when retaliating against Plaintiff and the Class.

413.     Defendants' retaliation impaired a contractual employment relationship of Plaintiff.

414.     Defendants Kletter, Levario, and/or Fabian were personally involved in the retaliation against Plaintiff.

415.     Upon information and belief, Defendant Fabian was personally involved in the retaliation against the Class.

416.    Upon information and belief, Defendant City and Defendant Fabian, pursuant to a municipal policy, custom, practice and/or procedure of retaliation, retaliated against Plaintiff, and upon information and belief, the 1981 Class, because of their protected EEO complaints regarding race, ethnicity and/or ancestry (and/or related retaliation) by conducting bad faith, pre-determined, and/or inadequate EEO investigations, resulting in "unsubstantiated" findings for EEO complaints referred to the Law Department for investigation, and/or by making statements to complainants that the complaints were "unsubstantiated", despite having found evidence of violations of the NYCHRL, each of which were material adverse actions against the 1981 Class, that could well dissuade a reasonable worker from engaging in protected activity, including but not limited to, filing a public lawsuit concerning the subject matter of their EEO complaint.

417.    Defendants were aware of Plaintiff's protected complaints.

418.    Defendant City and Defendant Fabian were aware of the protected complaints of the 1981 Class.

419.    Defendants' conduct violated Section 1981.

420.    Defendants' illegal retaliation caused Plaintiff's injuries, and upon information and belief, injuries to the 1981 Class.

421.    Plaintiff and the 1981 Class were citizens or persons within the jurisdiction of the United States within the meaning of 42 U.S.C. § 1981.

422.    But for Plaintiff's and the 1981 Class's protected activity of complaining about and/or opposing race, ethnicity, and/or ancestry discrimination and/or related retaliation, Plaintiff's injuries, and upon information and belief, the 1981 Class's injuries, would not have occurred.

423.    At all times relevant to the Complaint, Defendants were covered persons within

the meaning of 42 U.S.C. § 1981.

424.     Upon information and belief, Defendants Kletter, Fabian, and Levario engaged in intentional discrimination with malice or a reckless indifference to the federally protected rights of Plaintiff and the 1981 Class.

425.     As a direct and proximate result of Defendants' unlawful employment practices, Plaintiff, and upon information and belief the 1981 Class, have suffered and are entitled to damages, as well as injunctive and declaratory relief.

**FIFTH CAUSE OF ACTION**
**Deprivation of Equal Protection of Laws**
**in Violation of 42 U.S.C. § 1983**
**(Brought on Behalf of Plaintiff Against the City)**
**(Brought on Behalf of the 1983 Class Against Defendant City)**

426.     Plaintiff hereby realleges and incorporates by reference all allegations in the preceding paragraphs.

427.     Defendant City acting under color of state law, deprived Plaintiff and the 1983 Class, of federally protected rights secured by the Fourteenth Amendment of the U.S. Constitution, with reckless and/or callous indifference, as motivated by evil intent.

428.     Upon information and belief, Defendant City, operating under color of state law, and by having an accepted custom policy and/or practice, with respect to Plaintiff and the 1983 Class, has violated Section 1983 by way of the practice, policy, and/or procedure of: (1) discouraging EEO complaints concerning race and/or sex discrimination (and/or related retaliation claims); (2) not treating oral EEO complaints of race and sex discrimination (and/or related retaliation claims) as EEO complaints; (3) discouraging complaints of any kind concerning Commissioners, Agency Heads, and/or EEO Officers; (4) ignoring and/or taking no action in response to EEO complaints of race and/or sex discrimination (and/or related retaliation claims); (5) attempting to discourage and/or attempting to avoid employees filing of formal

written EEO complaints of race and/or sex discrimination (and/or related retaliation claims) including following submission of an initial oral complaint; (6) conducting bad faith investigations of EEO complaints of race and/or sex discrimination for which the outcome that they were "unsubstantiated" was pre-determined; (7) referral of EEO complaints of race and/or sex discrimination (and/or related retaliation complaints) to the City Law Department to conduct bad faith investigations of EEO complaints for which the outcome that they were unsubstantiated was pre-determined; (8) permitting and/or encouraging retaliation by the Commissioner, Agency Head, EEO Officers against whom the 1983 Class filed EEO complaints of race discrimination and/or sex discrimination by failing to address, acquiescing to, constructively acquiescing to, encouraging, and/or permitting race discrimination, sex discrimination, and/or related retaliation, through an accepted custom, practice, policy, and/or procedure of ignoring these EEO complaints and/or retaliating in response to these EEO complaints.

429.    Upon information and belief, Defendant City has also failed, with respect to Plaintiff and the 1983 Class, to sufficiently train Commissioners, Agency Heads, and EEO officers and/or supervise its Commissioners, Agency Heads, and EEO Officers in order to: (1) appropriately and timely identify oral complaints of discrimination and/or retaliation as protected EEO complaints regardless of whether they are subsequently submitted as written complaints; and (2) appropriately identify potential discrimination and retaliation violations; and (3) refrain from retaliating and/or instructing others to refrain from retaliating against employees who make EEO complaints concerning Commissioners, Agency Heads, and/or EEO Officers.

430.    Upon information and belief, Defendant City, with respect to Plaintiff and the 1983 Class, failed to sufficiently train and/or supervise its Commissioners, Agency Heads, and EEO Officers regarding protected EEO complaints, as to display a deliberate indifference to the

constitutional rights of employees, including Plaintiff and the 1983 Class, who made protected EEO complaints.

431.    Upon information and belief, Defendant City has failed to sufficiently train and/or supervise Commissioners, Agency Heads, and EEO officers, regarding how to appropriately identify oral complaints as protected EEO complaints, regardless of whether they are subsequently submitted as written complaints.

432.    As a direct and proximate result of Defendant City's accepted customs, practices, policies, and/or procedures, Plaintiff, and upon information and belief, the 1983 Class, have suffered damages.

433.    Defendant City's illegal conduct proximately caused Plaintiff's injuries, and upon information and belief, injuries to the 1983 Class.

434.    As a direct and proximate result of Defendant City's accepted customs, practices, policies, and/or procedures, Plaintiff, and upon information and belief the 1983 Class, have suffered damages.

435.    Upon information and belief, the City's custom, policy, or practice, of: (1) failing to conduct good-faith investigations of protected EEO complaints; (2) failing to acknowledge oral protected EEO complaints; and/or (3) retaliation against employees who made protected EEO complaints for race and/or sex discrimination, and/or related retaliation, against Commissioners, Agency Heads, and/or EEO Officers, was so consistent and widespread that, although not expressly authorized, constituted a custom or usage of which a supervising policy-maker must have been aware.

436.    For example, upon information and belief, a disproportionate and/or statistically significant number of the 1983 Class who filed protected EEO complaints against

Commissioners, Agency Heads, and/or EEO Officers were disciplined, terminated, and/or separated from employment shortly after filing an EEO complaint with Defendant City.

437.    Upon information and belief, Defendant City, through, DCAS, the Law Department, and/or the EEPC, failed to provide adequate training to Commissioners, Agency Heads, and/or EEO Officers concerning, *inter alia*, the validity of oral EEO complaints, and/or how to investigate, resolve, and remediate protected EEO complaints.

438.    Upon information and belief, Defendant City through DCAS, the Law Department, and/or the EEPC, failed to provide adequate supervision of Commissioners, Agency Heads, and/or EEO Officers concerning, *inter alia*, the validity of oral EEO complaints, and/or how to investigate, resolve, and remediate protected EEO complaints and/or how to do so without retaliation.

439.    Upon information and belief, Defendant City, through the EEPC, failed to adequately train, supervise, monitor, and/or advise DCAS concerning its EEO complaint policies, practices, and/or procedures.

440.    Upon information and belief, Defendant City's EEO officers were not knowledgeable regarding, or were not supervised to ensure compliance with, EEO laws, including concerning the validity of oral EEO complaints and/or how to investigate, resolve, and remediate protected EEO complaints and/or how to do so without retaliation.

441.    Upon information and belief, the need for additional training and/or supervision was obvious as there have been repeated complaints of civil rights violations and no meaningful and/or effective attempt on the part of the municipality to investigate or forestall further incidents.

442.     Upon information and belief, the need for additional training and/or supervision was obvious because of the violations, by DCAS, of its own EEO policy and training requirements, as documented by the EEPC.

443.     Upon information and belief, the need for additional training and/or supervision was obvious because of the numerous, repeated, and chronic violations of EEO policy and training requirements, by numerous Commissions and Agencies, as documented by the EEPC.

444.     Upon information and belief, Defendant City knew, to a moral certainty, that Defendant City through the Law Department and/or Fabian, would confront a given situation in which they would be called upon to resolve an EEO claim, and would have an inherent conflict of interest in resolving that claim fairly and accurately because of the Law Department and/or Fabian's conflict of interest in resolving the complaint in favor of the City and/or asserting that the complaint was not substantiated, and/or because of their duty of loyalty to Defendant.

445.     Defendant City could have and should have created an independent body to resolve EEO complaints outside the supervisory structure of Commissioners, Department Heads, and/or the City Law Department, and/or through an independent organization, independent ombudsman, and/or the Office of the New York City Public Advocate.

446.     Defendant City, was repeatedly aware of unconstitutional actions and insufficient EEO policies, including through the audits by the EEPC, and repeatedly, consciously chose to ignore them and/or acquiesce to their chronic failures, effectively ratifying these actions and non-compliance with EEO policies.

447.     Defendant City's above-described conduct frequently caused the deprivation of its employees' rights to work for the City without being subjected to race and/or sex discrimination and/or related retaliation concerning complaints of the same, because Commissioner, Agency

Heads, and/or EEO Officers were not adequately trained and/or supervised to prevent, identify, respond to, and/or take remedial actions in response to these equal protection violations.

448.    Defendant City's illegal conduct proximately caused Plaintiff's injuries, and upon information and belief, injuries to the 1983 Class.

449.    Defendants engaged in intentional discrimination with malice or a reckless indifference to the federally protected rights of Plaintiff and the 1983 Class.

450.    As a direct and proximate result of policies, practices, and/or procedures Plaintiff and, upon information and belief, the 1983 Class, have suffered and are entitled to damages, as well as declaratory and injunctive relief.

### SIXTH CAUSE OF ACTION
**Disparate Treatment, Hostile Work Environment, Harassment, and Stereotyping Race and/or Ancestry Discrimination in Violation of NYCHRL § 8-107(1) (Brought on Behalf of Plaintiff Against Defendants City, Kletter, and Levario)**

451.    Plaintiff hereby realleges and incorporates by reference all allegations in the preceding paragraphs.

452.    This claim is brought by Plaintiff on behalf of herself.

453.    Defendant City, Defendant Kletter, and Defendant Levario subjected Plaintiff to a race-based, ancestry-based, national-origin-based, and/or ethnicity-based disparate treatment, harassment, hostile work environment, and stereotyping discrimination, because, or in part because of, her Hispanic race, ethnicity, national origin, and/or ancestry.

454.    Defendant City, Defendant Kletter, and Defendant Levario treated Plaintiff less well than other employees, because of, or in part because, her Hispanic race, ethnicity, national origin, and/or ancestry, and/or because she was not Caucasian.

455.    Defendant City, Defendant Kletter, and Defendant Levario treated Plaintiff, and other non-Caucasian employees, including former Legal Director Mapp-Williams, less well,

throughout their employment with MOA, because of, or in part because of, their non-Caucasian race, ethnicity, national origin, and/or ancestry.

456.   Defendant City and Defendant Kletter promoted Defendant Levario over Plaintiff as Deputy Director of Research because of, or in part because of Plaintiff's Hispanic race, ethnicity, national origin, and/or ancestry, and/or because she was not Caucasian.

457.   Defendant City and Defendant Kletter and/or Defendant Levario demoted Plaintiff because of, or in part because of, Plaintiff's Hispanic race, ethnicity, national origin, and/or ancestry, and/or because she was not Caucasian.

458.   Defendant City, Kletter, and Levario's conduct rose above the level of petty slights and/or trivial inconveniences.

459.   Defendant City is strictly liable for Defendants Kletter and Levario's discrimination pursuant to N.Y.C. Admin. Code §§ 8-107(1), 8-107(13)(b).

460.   Defendants Kletter and Levario exercised managerial or supervisory responsibility for Defendant City and/or exercised managerial or supervisory responsibility over Plaintiff.

461.   Defendants Kletter and Levario were hired by and/or worked for Defendant City to carry out work in furtherance of Defendant City's business enterprise.

462.   Defendants Kletter and Levario's conduct was committed in the course of their work for and/or employment with Defendant City and, upon information and belief, Defendant City had actual knowledge of and acquiesced to such conduct.

463.   Upon information and belief, Defendant City knew of Defendants Kletter and Levario's discriminatory conduct and acquiesced to such conduct, and/or failed to take immediate and appropriate corrective action.

464.    Defendant City should have known of Defendants Kletter and Levario's discriminatory conduct and failed to exercise reasonable diligence to prevent such discriminatory conduct.

465.    Defendants Kletter and Levario, knew of some or all of each others' discriminatory conduct, and acquiesced in such conduct and/or failed to take immediate and appropriate corrective action.

466.    Defendant City, Defendant Kletter, and Defendant Levario's conduct violated the NYCHRL.

467.    Defendant City, Defendant Kletter, and Defendant Levario's creation of a Hispanic-based hostile work environment was a continuing violation.

468.    Defendant City, Kletter, and Levario engaged in harassment of Plaintiff because of, or in part because of, her Hispanic race, ethnicity, national origin, and/or ancestry.

469.    Defendant City, Kletter, and Levario engaged in stereotyping discrimination against Plaintiff, including but not limited to by, subjecting her and other Hispanic employees to stereotyping discrimination, including, but not limited to, treating them, characterizing them, and/or making statements to them that they were being "uncooperative" or "aggressive" when they were in fact merely being professionally assertive or firm in their work and/or role(s).

470.    Defendant Kletter discriminated against Plaintiff, because of, or in part because of Plaintiff's Hispanic identity, including but not limited to by declining to simply promote her to take Legal Director Mapp-Williams' position and instead merely broaching the topic as an obvious empty gesture.

471.    Defendant Kletter created a hostile work environment and/or engaged in harassment because of, or in part because of, Plaintiff's Hispanic identity.

472.    At all times relevant to the Complaint, Plaintiff was a covered employee within the meaning of the NYCHRL.

473.    At all times relevant to the Complaint, Plaintiff was a "person" and/or "employee" within the meaning of the NYCHRL.

474.    At all times relevant to the Complaint, Defendants Kletter and Levario were each an "employee" or "agent" of employer Defendant City.

475.    At all times relevant to the Complaint, Defendant City was a covered employer and/or joint employer within the meaning of the NYCHRL.

476.    Defendants City, Kletter, and Levario's discrimination had an impact within New York City, including at Defendant City's MOA offices located at 253 Broadway, 5th Floor, New York, New York 10007.

477.    At all times relevant to the Complaint, as well as in the year proceeding such relevant times, Defendant City employed more than four persons in its employ as employees and/or independent contractors.

478.    Defendant City, Defendant Kletter, and Defendant Levario's conduct constituted willful or wanton negligence, recklessness, and/or a conscious disregard of the rights of others or conduct so reckless as to amount to such disregard.

479.    Defendant City, Defendant Kletter and Defendant Levario proximately caused Plaintiff's injuries.

480.    As a direct and proximate result of Defendant City, Defendant Kletter and Defendant Levario's unlawful employment practices, Plaintiff is entitled to damages, including, but not limited to, back pay, front pay, emotional distress damages, attorney's fees, costs, and expert fees, as well as punitive damages against Defendant Kletter and Defendant Levario..

## SEVENTH CAUSE OF ACTION
**Disparate Treatment, Harassment, Hostile Work Environment, Stereotyping
Color Discrimination in Violation of NYCHRL § 8-107(1)
(Brought on Behalf of Plaintiff against Defendant City, Kletter, and Levario)**

481.     Plaintiff hereby realleges and incorporates by reference all allegations in the preceding paragraphs.

482.     This claim is brought by Plaintiff on behalf of herself.

483.     Defendant City, Defendant Kletter, and Defendant Levario's subjected Plaintiff to disparate treatment color discrimination, including color-based harassment, a color-based hostile work environment, and color stereotyping discrimination, because of, or in part because of, her brown skin.

484.     Defendant City, Defendant Kletter, and Defendant Levario treated Plaintiff less well than other employees, especially light-skinned Caucasian employees, because of, or in part because of, her brown skin.

485.     Defendant City, Defendant Kletter, and Defendant Levario treated Plaintiff, and other brown or dark-skinned employees, including former Legal Director Mapp-Williams, less well throughout their employment with MOA.

486.     Defendant City and Kletter promoted Defendant Levario over Plaintiff as Deputy Director of Research because of, or in part because of her brown skin, and/or because she was not light-skinned.

487.     Defendant City and Defendant Kletter and/or Defendant Levario demoted Plaintiff because of, or in part because of, her brown skin, and/or because she was not light-skinned.

488.     Defendant City, Defendant Kletter, and Defendant Levario's conduct rose above the level of petty slights and/or trivial inconveniences.

489.     Defendant City, Defendant Kletter, and Defendant Levario engaged in stereotyping discrimination against Plaintiff, including but not limited to by, subjecting her and other brown and dark-skinned employees to stereotyping discrimination, including, but not limited to, treating them, characterizing them, and/or making statements to them that they were being "uncooperative" or "aggressive" when they were in fact merely being professionally assertive or firm in their work and/or role(s).

490.     Defendant Kletter discriminated against Plaintiff, because of, or in part because of Plaintiff's brown and/or non-white skin, including but not limited to by declining to simply promote her to take Legal Director Mapp-Williams' position and instead merely broaching the topic as an obvious empty gesture.

491.     Defendant Kletter created a hostile work environment and/or engaged in harassment because of, or in part because of, Plaintiff's brown and/or non-white skin.

492.     Defendant City is strictly liable for Defendants Kletter and Levario's discrimination pursuant to NYCHRL §§ 8-107(1), 8-107(13)(b).

493.     Defendant City is liable for its discrimination pursuant to NYCHRL § 8-107(1).

494.     Defendant City, Defendant Kletter, and Defendant Levario's creation of a hostile work environment for employees with brown or black skin was a continuing violation.

495.     Defendant City, Defendant Kletter, and Defendant Levario's conduct rose above the level of petty slights and/or trivial inconveniences.

496.     Defendants Kletter and Levario exercised managerial or supervisory responsibility for Defendant City and/or exercised managerial or supervisory responsibility over Plaintiff.

497.     Defendants Kletter and Levario were hired by and/or worked for Defendant City to carry out work in furtherance of Defendant City's business enterprise.

498.     Defendants Kletter and Levario's discriminatory conduct was committed in the course of their work for and/or employment with Defendant City and, upon information and belief, Defendant City had actual knowledge of and acquiesced to such conduct.

499.     Upon information and belief, Defendant City knew of Defendant Kletter and Defendant Levario's discriminatory conduct and acquiesced to such conduct and/or failed to take immediate and appropriate corrective action.

500.     Defendant City should have known of Defendants Kletter and Levario's discriminatory conduct and failed to exercise reasonable diligence to prevent such discriminatory conduct.

501.     Defendants Kletter and Levario, knew of some or all of each others' discriminatory conduct and acquiesced in such conduct and/or failed to take immediate and appropriate corrective action.

502.     Defendant City, Kletter, and Levario's conduct violated the NYCHRL.

503.     Defendant City and Defendant Kletter failed to promote Plaintiff to Director of Vetting of MOA by deterring her from expressing interest in and/or applying for the position because of the standard operating procedure within the MOA of discrimination, harassment, and/or retaliation towards non-Caucasian female employees of MOA.

504.     At all times relevant to the Complaint, Defendants Kletter and Levario were a covered employee or agent of employer Defendant City.

505.     At all times relevant to the Complaint, Plaintiff was a covered employee and/or person within the meaning of the NYCHRL.

506.     At all times relevant to the Complaint, Defendant City was a covered employer and/or joint employer within the meaning of the NYCHRL.

507.     Defendant City, Defendant Kletter, and Defendant Levario's discrimination had an impact within New York City, including at Defendant City's MOA offices located at 253 Broadway, 5th Floor, New York, New York 10007.

508.     At all times relevant to the Complaint, as well as in the year proceeding such relevant times, Defendant City employed more than four persons in its employ as employees and/or independent contractors.

509.     Upon information and belief, Defendant City, Defendant Kletter, and Defendant Levario's conduct constituted willful or wanton negligence, recklessness, and/or a conscious disregard of the rights of others or conduct so reckless as to amount to such disregard.

510.     Defendant City, Defendant Kletter and Defendant Levario proximately caused Plaintiff's injuries.

511.     As a direct and proximate result of Defendant City, Defendant Kletter, and Defendant Levario's unlawful employment practices, Plaintiff has suffered and is entitled to damages, but not limited to, back pay, front pay, emotional distress damages, attorney's fees, costs, and expert fees, as well as punitive damages against Defendant Kletter and Defendant Levario.

## EIGHTH CAUSE OF ACTION
**Disparate Treatment, Hostile Work Environment, Harassment, Stereotyping
Race and/or Ethnicity Plus Gender Discrimination (Hispanic Female)
in Violation of NYCHRL § 8-107(1)
(Brought on Behalf of Plaintiff against Defendants City, Kletter, and Levario)**

512.     Plaintiff hereby realleges and incorporates by reference all allegations in the preceding paragraphs.

513.    This claim is brought by Plaintiff on behalf of herself.

514.    Defendant City, Defendant Kletter, and Defendant Levario subjected Plaintiff to a combination of gender and race-based, ancestry-based, and/or ethnicity-based disparate treatment, harassment, hostile work environment, and stereotyping discrimination, because of, or in part because of, a combination of her female gender and Hispanic race, ethnicity, national origin and/or ancestry.

515.    Defendant City, Defendant Kletter, and Defendant Levario treated Plaintiff less well than other employees, because of, or in part because, a combination of her female gender and Hispanic race, ethnicity, and/or ancestry, and/or because she was not a Caucasian male and/or Caucasian female.

516.    Defendant City, Defendant Kletter, and Defendant Levario treated Plaintiff, and other non-Caucasian female employees, including former Legal Director Mapp Williams, less well, throughout their employment with MOA, because of, or in part because of, a combination their female gender and their non-Caucasian race, ethnicity, national origin, and/or ancestry.

517.    Defendant City and Kletter promoted Defendant Levario over Plaintiff as Deputy Director of Research because of, or in part because of a combination of Plaintiff's Hispanic race, ethnicity, national origin, and/or ancestry, and/or because she was not a Caucasian man and/or woman.

518.    Defendant City and Defendant Kletter and/or Defendant Levario demoted Plaintiff because of, or in part because of, a combination of Plaintiff's female gender and Hispanic race, ethnicity, national origin, and/or ancestry, and/or because she was not a Caucasian man and/or woman.

519.     Defendant City, Defendant Kletter, and Defendant Levario's conduct rose above the level of petty slights and/or trivial inconveniences.

520.     Defendant City is strictly liable for Defendants Kletter and Levario's discrimination pursuant to NYCHRL §§ 8-107(1), 8-107(13)(b).

521.     Defendant City is liable for its discrimination pursuant to NYCHRL § 8-107(1).

522.     Defendants Kletter and Defendant Levario exercised managerial or supervisory responsibility for Defendant City and/or exercised managerial or supervisory responsibility over Plaintiff.

523.     Defendants Kletter and Defendant Levario were hired by and/or worked for Defendant City to carry out work in furtherance of Defendant City's business enterprise.

524.     Defendants Kletter and Defendant Levario's conduct was committed in the course of their work for and/or employment with Defendant City and, upon information and belief, Defendant City had actual knowledge of and acquiesced to such conduct.

525.     Upon information and belief, Defendant City knew of Defendants Kletter and Levario's discriminatory conduct and acquiesced to such conduct, and/or failed to take immediate and appropriate corrective action.

526.     Defendant City should have known of Defendants Kletter and Levario's discriminatory conduct and failed to exercise reasonable diligence to prevent such discriminatory conduct.

527.     Defendants Kletter and Levario, knew of some or all of each others' discriminatory conduct and acquiesced in such conduct and/or failed to take immediate and appropriate corrective action.

528.     Defendant City, Defendant Kletter, and Defendant Levario's conduct violated the NYCHRL.

529.     Defendant City, Defendant Kletter, and Defendant Levario's creation of a hostile work environment for Hispanic women was a continuing violation.

530.     Defendant City, Defendant Kletter, and Defendant Levario engaged in harassment of Plaintiff because, or in part because, she was a Hispanic woman.

531.     Defendant City, Defendant Kletter, and Defendant Levario engaged in stereotyping discrimination against Plaintiff, including but not limited to by, subjecting her and other Hispanic females to discriminatory tropes and/or stereotypes concerning Hispanic women, and/or non-Caucasian women, including, but not limited to, treating them, characterizing them, and/or making statements to them that they were being "uncooperative" or "aggressive" when they were in fact merely being professionally assertive or firm in their work and/or role(s).

532.     Defendant Kletter discriminated against Plaintiff, because of, or in part because of Plaintiff's Hispanic female identity, including but not limited to by declining to simply promote her to take Legal Director Mapp-Williams' position and instead merely broaching the topic as an obvious empty gesture.

533.     Defendant Kletter created a hostile work environment and/or engaged in harassment because of, or in part because of, Plaintiff's Hispanic female identity.

534.     At all times relevant to the Complaint, Plaintiff was a covered person and/or employee within the meaning of the NYCHRL.

535.     At all times relevant to the Complaint, Defendants Kletter and Levario were each an "employee" or "agent" of employer Defendant City.

536.     At all times relevant to the Complaint, Defendant City was a covered employer and/or joint employer within the meaning of the NYCHRL.

537.     Defendant City, Defendant Kletter, and Defendant Levario's discrimination had an impact within New York City, including at Defendant City's MOA offices located at 253 Broadway, 5th Floor, New York, New York 10007.

538.     At all times relevant to the Complaint, as well as in the year proceeding such relevant times, Defendant City employed more than four persons in its employ as employees and/or independent contractors.

539.     Defendant City, Defendant Kletter and Defendant Levario proximately caused Plaintiff's injuries.

540.     Defendants' conduct constituted willful or wanton negligence, recklessness, and/or a conscious disregard of the rights of others or conduct so reckless as to amount to such disregard.

541.     As a direct and proximate result of Defendant City, Defendant Kletter, and Defendant City's unlawful employment practices, Plaintiff is entitled to damages, including, but not limited to, back pay, front pay, emotional distress damages, attorney's fees, costs, and expert fees, as well as punitive damages against the Defendant Kletter and Defendant Levario.

**NINTH CAUSE OF ACTION**
**Aiding, Abetting, Coercing, and/or Inciting and Attempted Aiding, Abetting, Coercing,**
**and/or Inciting in Violation of NYCHRL § 8-107(6)**
**(Brought on Behalf of Plaintiff Against All Defendants)**
**(Brought on Behalf of the Class Against Defendant City and Defendant Fabian)**

542.     Plaintiff hereby realleges and incorporates by reference all allegations in the preceding paragraphs.

543.    At all times relevant to the Complaint, Defendants were each a person within the meaning of the NYCHRL.

544.    Plaintiff and the NYCHRL Class engaged or attempted to engage in protected activity under the NYCHRL by complaining about, opposing, and/or attempting to complain about and/or oppose NYCHRL violations.

545.    Defendants each aided, abetted, incited, compelled, and/or coerced, and/or attempted to aid, abet, incite and/or coerce each other's above-described NYCHRL violations against Plaintiff.

546.    Defendants each provided assistance to and/or attempted to provide assistance to each other's NYCHRL violations against Plaintiff as described herein.

547.    Defendant City and/or Defendant Fabian provided assistance to and/or attempted to provide assistance to each other's NYCHRL violations concerning finding that EEO complaints by the NYCHRL Class were unsubstantiated.

548.    Defendant Fabian provided assistance to and/or attempted to provide assistance to Defendant Kletter and Defendant Levario by finding that Plaintiff's EEO complaint against them was unsubstantiated.

549.    Defendant Fabian provided assistance to and/or attempted to provide assistance to Defendant City by finding that Plaintiff's EEO complaint against Defendant City was unsubstantiated.

550.    Defendant Fabian provided assistance to and/or attempted to provide assistance to Commissioners, Heads of Agency, and/or EEO Officers (including Kletter concerning Plaintifff) by finding that EEO complaints made against them were unsubstantiated and/or  (1) failing to properly, fully, and/or fairly investigate employee complaints of discrimination, discriminatory

harassment, and/or retaliation referred to and/or dealt with by the Law Department; (2) failing to alert complainants that the Law Department has an inherent conflict of interest as the Law Department is primarily tasked with defending the Defendant City in any litigation involving the City, including any subsequent litigation that would likely ensue if the Law Department substantiates an employee's complaint of discrimination, discriminatory harassment, and/or retaliation; and (3) issuing bad faith, *pro forma*, and/or pre-determined "unsubstantiated" determinations in response to City employee complaints of discrimination, discriminatory harassment, and/or retaliation, the intent of which was to deter EEO complaints from taking further legal or other action against the City, instead of conducting an unbiased investigation the purpose of which was to identify and communicate violations of the NYCHRL.

551.    Defendant City is strictly liable for Defendant Kletter, Defendant Levario, and Defendant Fabian's aiding, abetting, coercing, inciting, and/or attempted aiding, abetting, coercing, and/or inciting NYCHRL violations pursuant to NYCHRL §§ 8-107(6), 8-107(13)(a).

552.    Defendants Kletter, Levario, and Fabian each participated in the conduct giving rise to these NYCHRL violations and/or attempted to do so.

553.    Defendant City participated in the conduct giving rise to these NYCHRL violations and/or attempted to do so.

554.    Defendants Kletter, Levario, and Fabian's conduct constituted willful or wanton negligence, recklessness, and/or a conscious disregard of the rights of others or conduct so reckless as to amount to such disregard.

555.    Defendant City and Fabian aided, abetted, and/or incited each other's above-described NYCHRL violations against the NYCHRL Class, by providing and/or attempting to provide assistance to each other concerning these NYCHRL violations.

556.     Defendant City, through the City Law Department and/or Fabian aided, abetted, and/or incited the NYCHRL violations of Commissioners, Agency Heads, and/or EEO Officers by providing and/or attempting to provide assistance to the Commissioners, Agency Heads, and/or EEO Officers' NYCHRL violations that were the subject of the EEO complaints by the NYCHRL Class.

557.     Defendant Fabian aided and abetted Defendant City by conducting bad faith, pre-determined, and/or inadequate EEO investigations, resulting in "unsubstantiated" findings for EEO complaints referred to the Law Department for investigation concerning the NYCHRL Class, and/or in statements to the NYCHRL Class that the complaints were "unsubstantiated" despite having found evidence of violations of the NYCHRL.

558.     Upon information and belief, Defendant City and/or Defendant Fabian had a policy and/or practice of aiding and abetting and/or attempting to aid and abet NYCHRL violations of Commissioners, Agency Heads, and/or EEO Officers, including but not limited to by issuing findings that EEO complaints filed against Commissioners, Agency Heads, and/or EEO Officers were unsubstantiated.

559.     Defendant City, through DCAS, knew or should have known, that its EEO complaint policies: (1) failed to incorporate the legal standards of the NYCHRL; and/or (2) resulted in referrals of EEO complaints to the Law Department that had an inherent conflict of interest that prevented it from conducting a good faith EEO investigation of claims it would later be forced to defend Defendant City against in Court, by continuing to implement these policies without modification, despite knowledge of their impact of aiding, abetting, coercing, inciting NYCHRL violations by Commissioners, Agency Heads, and/or EEO Officers, and/or by not taking steps to remedy these policies

560.     Defendant City, through DCAS, aided, abetted, and/or incited NYCHRL violations by Commissioners, Agency Heads, and/or EEO Officers, by not taking steps to remedy these policies, including following a determination that an EEOC complaint was unsubstantiated and/or by issuing inaccurate, bad faith, false, and/or pre-determined determinations that the EEO complaints against these persons were unsubstantiated.

561.     Defendant City, through the EEPC, knew or should have known, through its auditing of Defendant City's Agencies, Offices, and Commissions that DCAS's EEO complaint and anti-retaliation policies, practices, and procedures were ineffective and/or routinely ignored by Defendant City's EEO Officers, human resources personnel, Commissioners, Heads of Agencies, and/or EEO Officers, and aided, abetted, and/or incited NYCHRL violations, including by Commissioners, Agency Heads, and/or EEO Officers, by failing to improve, strengthen and/or effectively increase enforcement of these policies, and/or by otherwise taking no action to remedy this systemic EEO complaint system failure.

562.     Defendant City, through DCAS, knew or should have known, that its EEO complaint policies provided no clear standard and/or burden of proof for the Law Department, EEO Officers, Commissioners, and/or Agency Heads to make determinations and/or recommended findings concerning EEO complaints, and that, in the absence of such standards and/or in the knowing continued failure to implement any such standards, aided, abetted, and/or incited NYCHRL violations by Commissioners, Agency Heads, and/or EEO Officers, including by Defendant City and/or Defendant Fabian failing to properly identify violations of the NYCHRL.

563.     Defendant City aided and abetted the NYCHRL violations of Commissioners, Agency Heads, and/or EEO Officers (including Kletter concerning Plaintiff) through the: (1)

referral of investigation of EEO complaints concerning Commissioners, Agency Heads, and/or

EEO Officers to the Law Department; (2) issuance of an EEO policy that did not state the "less

well" discrimination standard of the NYCHRL to Commissioners, Agency Heads, EEO Officers,

and/or the Law Department; (3) issuance of an EEO policy that did not state the "adverse"

retaliation standard of the NYCHRL to Commissioners, Agency Heads, EEO Officers, and/or the

Law Department; (4) issuance of an EEO policy that did not provide any clear standard and/or

burden of proof, including for the Law Department to apply to determine when it should issue

determinations that an EEO complaint was substantiated; and/or (5) conducting bad faith, pre-

determined, and/or inadequate EEO investigations and/or issuing  bad faith, pre-determined

"unsubstantiated" findings for EEO complaints referred to the Law Department for investigation,

and/or of making statements to complainants that the complaints were "unsubstantiated" despite

having found evidence of violations of the NYCHRL.

564.     Defendant Fabian aided and abetted the NYCHRL violations of Commissioners,

Agency Heads, and/or EEO Officers (including Kletter concerning Plaintiff) through by

conducting bad faith, pre-determined, and/or inadequate EEO investigations and/or issuing bad

faith, pre-determined "unsubstantiated" findings for EEO complaints referred to the Law

Department for investigation, and/or of making statements to complainants that the complaints

were "unsubstantiated" despite having found evidence of violations of the NYCHRL.

565.     Defendant City was a person within the meaning of 8-107(6).

566.     Defendants Kletter, Fabian, and Levario were persons within the meaning of 8-

107(6).

567.     Defendants' violations of NYCHRL § 8-107(6) had an impact within New York City, including at Defendant City's MOA offices located at 253 Broadway, 5th Floor, New York, New York 10007.

568.     At all times relevant to the Complaint, as well as in the year proceeding such relevant times, Defendant City employed more than four persons in its employ as employees and/or independent contractors.

569.     Defendant City is strictly liable for Defendants Kletter, Levario, and Fabian's violations of NYCHRL § 8-107(6) pursuant to NYCHRL §§ 8-107(6), 8-107(13)(a).

570.     Defendant City is liable for its violations of NYCHRL § 8-107(6) and/or policy and/or practice of violating § 8-107(6) pursuant to §§ 8-107(6), 8-107(13)(a).

571.     Defendants each participated in the conduct giving rise to these NYCHRL violations against Plaintiff and/or the NYCHRL Class and/or attempted to do so.

572.     Defendants' conduct constituted willful or wanton negligence, recklessness, and/or a conscious disregard of the rights of others or conduct so reckless as to amount to such disregard.

573.     As a direct and proximate result of Defendants' aiding, abetting, inciting, and/or attempts to aid, abet, incite, each other's NYCHRL violations described herein, Plaintiff, and upon information and belief the NYCHRL Class, have suffered and are entitled to damages, as well as declaratory and injunctive relief.

## TENTH CAUSE OF ACTION
**Coercion, Intimidation, Interference, and/or Threats, and
Attempted Coercion, Intimidation, Interference, and/or Threats
in Violation of NYCHRL § 8-107(19)
(Brought on Behalf of Plaintiff Against All Defendants)
(Brought on Behalf of the NYCHRL Class Against Defendant City and Fabian)**

574.     Plaintiff hereby realleges and incorporates by reference all allegations in the preceding paragraphs.

575.     Plaintiff and the NYCHRL Class engaged, or attempted to engage, in protected activity under the NYCHRL including, but not limited to, by complaining about, opposing, and/or attempting to complain about and/or oppose NYCHRL violations by Defendant City's Commissioners, Heads of Agency, and/or EEO Officers.

576.     Plaintiff engaged, or attempted to engage, in protected activity under the NYCHRL by informing Mapp-Williams concerning NYCHRL violations by Kletter against her.

577.     Defendant City and Defendant Fabian coerced, intimidated, threatened, and/or interfered with the exercise and/or enjoyment of NYCHRL rights of Plaintiff and the NYCHRL Class, and/or attempted to coerce, intimidate, threaten, and/or interfere with the NYCHRL rights of Plaintiff and the NYCHRL Class to engage in protected activity of complaining about discrimination, discriminatory harassment, and/or related retaliation, without suffering retaliation.

578.     Defendant City and/or Defendant Fabian coerced, intimidated, and/or interfered with Plaintiff's and the NYCHRL Class's NYCHRL rights, and/or attempted to coerce, intimidate, and/or interfere with Plaintiff's and NYCHRL Class's exercise and/or enjoyment of their NYCHRL rights, including, without limitation, by its Law Department having a policy or practice of: (1) failing to properly, fully, and/or fairly investigate employee complaints of discrimination, discriminatory harassment, and/or retaliation referred to and/or dealt with by the Law Department; (2) failing to alert complainants that the Law Department has an inherent conflict of interest as the Law Department is primarily tasked with defending the Defendant City in any litigation involving the City, including any subsequent litigation that would likely ensue if

the Law Department substantiates an employee's complaint of discrimination, discriminatory harassment, and/or retaliation; and (3) issuing bad faith, *pro forma*, and/or pre-determined "unsubstantiated" determinations in response to City employee complaints of discrimination, discriminatory harassment, and/or retaliation, the intent of which was to deter EEO complaints from taking further legal or other action against the City, instead of conducting an unbiased investigation the purpose of which was to identify and communicate violations of the NYCHRL.

579.    Defendant City's Law Department's aforementioned practices and/or policies coerced, intimidated, and/or interfered with, and/or attempted to coerce, intimidate, and/or interfere with Plaintiff's, and the NYCHRL Class's NYCHRL right to make complaints of discrimination and/or retaliation.

580.    For example, the Law Department and/or Defendant Fabian's pro forma or pre-determined "unsubstantiated" findings in response to City employee's EEO complaints coerced, intimidated, and/or interfered with and/or attempted to coerce, intimidate, and/or interfere with Plaintiff and the NYCHRL Class: (1) further pursuing their EEO complaints, including in litigation, and especially against Commissioners, Agency Heads, and EEO Officers; (2) complaining about subsequent NYCHRL violations by the same or other Commissioners, Agency Heads, and/or EEO Officers.

581.    Defendants' conduct had a reasonable tendency to coerce or intimidate employees.

582.    Defendants' conduct rose above the level of petty slights and/or trivial inconveniences.

583.    Defendants' conduct violated the NYCHRL.

584.    At all times relevant to the Complaint, Plaintiff and the NYCHRL Class were covered persons and/or employees within the meaning of the NYCHRL.

585.    At all times relevant to the Complaint, Defendants were each a covered person within the meaning of the NYCHRL.

586.    Defendants City, Defendant Kletter, and/or Defendant Levario coerced, intimidated, threatened, and/or interfered with, and/or attempted to coerce, intimidate, threaten, and/or interfere with Plaintiff's exercise and/or enjoyment of her NYCHRL rights, including, but not limited to by: (1) Defendant Kletter intimidating and/or threatening and/or attempting to intimidate and/or threaten Plaintiff with retaliation in response to her disclosures to Mapp-Williams concerning Kletter's discriminatory and retaliatory statements; (2) Defendant Kletter and Levario intimidating and/or threatening and/or attempting to intimidate and/or threaten Plaintiff concerning her submission of her subordinate's sexual harassment complaint; (3) retaliating against and/or taking adverse actions against Plaintiff because of her protected complaints and/or opposition.

587.    Defendant City is strictly liable for Defendant Kletter, Defendant Levario, and Defendant Fabian's coercion, intimidation, threats, and/or interference and attempted coercion, intimidation, threats and/or interference violations pursuant to NYCHRL § 8-107(13)(a), 8-107(13)(a).

588.    Defendant City is liable for its policies and/or practices of coercion, intimidation, threats, and/or interference and/or attempted coercion, intimidation, threats, and/or interference violations, and additional violations of § 8-107(19), pursuant to NYCHRL § 8-107(19).

589.    Defendants' coercion, intimidation, threat, and/or interference and/or attempted coercion, intimidation, threats, and/or interference had an impact within New York City,

including at Defendant City's MOA offices located at 253 Broadway, 5th Floor, New York, New York 10007.

590.    At all times relevant to the Complaint, as well as in the year proceeding such relevant times, Defendant City employed more than four persons in its employ as employees and/or independent contractors.

591.    Defendants' illegal conduct proximately caused Plaintiff's, and upon information the NYCHRL Class's injuries.

592.    Defendants' conduct constituted willful or wanton negligence, recklessness, and/or a conscious disregard of the rights of others or conduct so reckless as to amount to such disregard.

593.    As a direct and proximate result of Defendants' violations of the NYCHRL, Plaintiff and, upon information and belief, the NYCHRL Class, have suffered and are entitled to damages, as well as declaratory, and injunctive relief.

## ELEVENTH CAUSE OF ACTION
### Retaliation in Violation of NYCHRL § 8-107(7)
### (Brought on Behalf of Plaintiff Against All Defendants)
### (Brought on Behalf of the NYCHRL Class Against Defendant City and Defendant Fabian)

594.    Plaintiff hereby realleges and incorporates by reference all allegations in the preceding paragraphs.

595.    Plaintiff engaged in protected activities, including making internal complaints of unlawful discrimination, opposing unlawful discrimination by Defendants, and making an EEO complaint complaining of Defendants' discriminatory policies and/or practices.

596.    The NYCHRL Class engaged in the protected activity of making EEO complaints concerning Commissioners, Agency Heads, and/or EEO Officers.

597.    Defendants were aware that Plaintiff engaged in protected activities.

598.   Defendants were aware that the NYCHRL Class engaged in protected activity.

599.   Because of, or in part because of, this protected activity, Defendant City, Defendant Kletter, and/or Defendant Levario engaged in adverse actions against Plaintiff, including, but not limited to, stripping her of job duties, pretextually criticizing her ability to do work because it was purportedly too difficult for her, declining to simply promote her to take Legal Director Mapp-Williams' position, ignoring Plaintiff in meetings, excluding her from assignments relevant to her title, no longer inviting her on jogs demoting her, and attempting to force her to sign a confidentiality agreement concerning the subject matter of her EEO complaint, each of which were adverse actions and/or actions reasonably likely to deter a person from engaging in protected activity.

600.   Upon information and belief, because of, or in part because of, the NYCHRL Class's protected activity of making an EEO complaint concerning a Commissioner, Agency Head, and/or EEO Officer, Defendant City and/or Defendant Fabian engaged in adverse actions against the NYCHRL Class, including but not limited to providing a finding that their EEO complaints were "unsubstantiated," conducting a bad faith investigation of their EEO complaints, conducting pre-determined investigations of their EEO complaints, and/or failing to accurately communicate the actual results of their EEO complaint investigations, which were adverse actions and/or actions reasonably likely to deter a person from engaging in protected activity, including but not limited to, filing a public lawsuit concerning the subject matter of their EEO complaint.

601.   The above-described retaliatory conduct could well have dissuaded a reasonable worker from engaging in protected activity.

602.     A causal connection exists between Plaintiff's protected activity and Defendants' adverse actions.

603.     A causal connection exists between the NYCHRL Class's protected activity and Defendant City and Defendant Fabian's adverse actions.

604.     Defendants' conduct rose above the level of petty slights and/or trivial inconveniences.

605.     At all times relevant to the Complaint, Defendants were a covered person within the meaning of the NYCHRL.

606.     At all times relevant to the Complaint, Plaintiff and the NYCHRL Class were covered persons within the meaning of the NYCHRL.

607.     Defendants' retaliation had an impact within New York City, including at Defendant City's MOA offices located at 253 Broadway, 5th Floor, New York, New York 10007.

608.     At all times relevant to the Complaint, as well as in the year proceeding such relevant times, Defendant City employed more than four persons in its employ as employees and/or independent contractors.

609.     Defendant City is strictly liable for the retaliation of Defendant Kletter, Defendant Levario, and Defendant Fabian pursuant to NYCHRL §§ 8-107(7), 8-107(13)(a).

610.     Defendant City is liable for its retaliation and/or policy and/or practice of retaliation, pursuant to NYCHRL § 8-107(7).

611.     Defendants' illegal conduct proximately caused Plaintiff's injuries, and upon information and belief, injuries to the NYCHRL Class.

612.     As a direct and proximate result of Defendants' conduct, Plaintiff and, upon

information and belief, the NYCHRL Class, have suffered and are entitled to damages, as well as

injunctive relief, and declaratory relief.

613.     Defendants' conduct constituted willful or wanton negligence, recklessness,

and/or a conscious disregard of the rights of others or conduct so reckless as to amount to such

disregard.

### TWELFTH CAUSE OF ACTION
**Disparate Impact in Violation of NYCHRL § 8-107(17)**
**(Brought on Behalf of Plaintiff Against Defendant City)**
**(Brought on Behalf of the NYCHRL Class Against Defendant City)**

614.     Plaintiff hereby realleges and incorporates by reference all allegations in the

preceding paragraphs.

615.     At all times relevant to the Complaint, Defendant City was a covered person,

employer, and/or agent of an employer within the meaning of the NYCHRL.

616.     At all times relevant to the Complaint, Plaintiff and the NYCHRL Class were

covered persons and/or employees within the meaning of the NYCHRL.

617.     Plaintiff and the NYCHRL Class were a group protected by the provisions of

Section 8-107(7), because they were persons who had engaged in protected activity because they

made an EEO complaint concerning a violation of the NYCHRL.

618.     Upon information and belief, at all times relevant to the Complaint, through at

least 2020, Defendant City had a policy and/or practice of: (1) referral of investigation of many

EEO complaints concerning Commissioners, Agency Heads, and/or EEO Officers to the Law

Department; (2) issuance of an EEO policy that did not state the "less well" discrimination

standard of the NYCHRL to the Law Department; (3) issuance of an EEO policy that did not

state the correct "adverse" retaliation standard of the NYCHRL to the Law Department; (4)

issuance of an EEO policy that did not provide any clear standard and/or burden of proof for the

Law Department to apply to determine when it should issue determinations that an EEO

complaint was substantiated; and (5) conducting bad faith, pre-determined, and/or inadequate

EEO investigations and/or issuing bad faith, pre-determined "unsubstantiated" findings for EEO

complaints referred to the Law Department for investigation, and/or of making statements to

complainants that the complaints were "unsubstantiated" despite having found evidence of

violations of the NYCHRL.

619.    Upon information and belief, Defendant City's EEO policies' failure to provide

clear standards concerning the application of the NYCHRL and/or the burden of proof for the

Law Department to make determinations of EEO complaints, has resulted in the subjective,

biased, inadequate, non-objective, self-serving, pretextual, false, and/or unvalidated criteria,

justifications, and/or rationales in evaluating protected EEO complaints, which has had a

disparate impact of discipline, resignations, and/or terminations on Plaintiff and the NYCHRL

Class employees, who have made these protected EEO complaints subsequently referred to the

Law Department.

620.    Upon information and belief, these policies and/or practices, individually and/or

collectively caused and/or contributed to a disparate impact on Plaintiff and the NYCHRL Class,

by way of disproportionate and/or statistically significant higher rates of discipline, resignation,

and/or terminations, following the issuance of a finding by the Law Department concerning their

EEO complaint.

621.    Upon information and belief, each of these policies, or the effect of these policies

combined, resulted in a disparate impact, in the form of increased, disproportionate, and/or

statistically significant discipline, demotion, termination, and/or resignations, for Plaintiff and

the NYCHRL Class. These policies and/ or practices individually and/or collectively, caused Plaintiff and the NYCHRL Class to be disproportionately (pretextually) disciplined, demoted, terminated, and/or resigned, as contrasted with Defendant City employees who have not made protected EEO complaints.

622.    Upon information and belief, these policies were not consistent with business necessity.

623.    Upon information and belief, these policies have not had a legitimate significant relationship to a significant business objective of Defendant City, including, but not limited to, because Defendant City: (1) does not have a significant business objective in failing to accurately identify and investigate EEO complaints; and (2)  does not have a significant business interest in misinforming the Law Department, Commissioners, Agency Heads, and/or EEO Officers, or employees generally, concerning the applicable legal and/or conduct standards required by the NYCHRL -- which law and amendments were adopted and passed as legislation by the New York City Council and signed by the Mayor.

624.    Defendant City could have used less discriminatory measures, instead of some or all of these policies, including, but not limited to: (1) referral of EEO complaints against Commissioners, Agency Heads, and/or EEO Officers to an outside investigatory firm, independent ombudsman, and/or the office of the New York City Public Advocate instead of to the Law Department; (2) promulgation of an EEO policy that correctly stated the NYCHRL's "less well" discrimination and "adverse" action retaliation standards; (3) promulgation of an EEO policy that provided a correct and clear standard and/or burden of proof, including for the Law Department to apply; and (4) conducting good faith, unbiased, and/or adequate EEO investigations and/or issuing good faith objective determinations for EEO complaints referred to

the Law Department for investigation, and/or making accurate statements in response to complaints concerning the outcome of the investigation of the EEO Complaint.

625.    Defendant City is directly liable pursuant to §§ 8-107(7), 8-107(17) and/or strictly liable pursuant to §§ 8-107(7), 8-107(13)(a), 8-107(17).

626.    Defendant City's disparate impact NYCHRL violations had an impact within New York City, including at Defendant City's MOA offices located at 253 Broadway, 5th Floor, New York, New York 10007.

627.    Defendant City's illegal conduct proximately caused Plaintiff's injuries, and upon information and belief, injuries to the NYCHRL Class.

628.    At all times relevant to the Complaint, as well as in the year proceeding such relevant times, Defendant City employed more than four persons in its employ as employees and/or independent contractors.

629.    As a direct result of Defendant City's conduct, Plaintiff has suffered damages.

630.    As a direct and proximate result of Defendant City's conduct, Plaintiff and, upon information and belief, the NYCHRL Class, have suffered and are entitled to damages, as well as injunctive and declaratory relief.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff requests the following relief:

(a)    Certification of the above-described Class(es) pursuant to Rule 23 of the Federal Rules of Civil Procedure;

(b)    Designation of Plaintiff as class representative of the Class(es);

(c)    Designation Plaintiff's counsel as class counsel of the Class(es);

(d)    Issuance of a declaratory judgment, on behalf of the Class(es), declaring the acts complained of herein towards Plaintiff and/or the Class(es) are in violation of the

NYCHRL, FMLA, Section 1981, and Section 1983, and that Defendants are liable for any damages resulting therefrom;

(e)      An injunction, on behalf of the Class(es), permanently restraining the above-described violations of the NYCHRL, FMLA, Section 1981, and Section 1983, including for the class, an injunction requiring the creation of an independent office and/or ombudsman, or referral to the Officer of the New York City Public Advocate, to objectively re-evaluate all prior Law Department determinations of unsubstantiated EEO complaints issued within the class period(s) for EEO complaints concerning Commissioners, Agency Heads, and/or EEO officers, and similar referral to investigate all future EEO complaints concerning Commissioners, Agency Heads, and/or EEO Officers;

(f)      Compensatory damages for Plaintiff;

(g)      Back pay for Plaintiff;

(h)      Front pay for Plaintiff;

(i)      Pre-judgment interest for Plaintiff;

(j)      Post-judgment interest for Plaintiff;

(k)      Punitive damages for Plaintiff against Kletter, Levario, and Fabian;

(l)      An award of reasonable attorneys' fees, expert fees, and costs;

(m)      Liquidated damages for Plaintiff;

(n)      Individual injunctive and declaratory relief for Plaintiff including reinstatement; and

(o)      All such other and further relief as the Court deems necessary and proper.

## <u>JURY DEMAND</u>

Plaintiff hereby demands a jury trial.

Dated: July 20, 2022
       Long Island City, New York

                                    Respectfully submitted,

                                    By:_____/s/ Cyrus E. Dugger_____
                                         Cyrus E. Dugger

**THE DUGGER LAW FIRM, PLLC**
Cyrus E. Dugger
Gotham Center
28-07 Jackson Ave., 5th Fl.
Long Island City, NY 11101
Tel: (646) 560-3208
Fax: (646) 390-4524
cd@theduggerlawfirm.com